OPINION
Opinion by
Justice Moseley
Mickey Lee Bates rammed his Ford pickup truck, into the porch of his neighbor’s apartment, .pinning.-his neighbor, Tommy Whitlock, between the truck and the detritus of the destroyed porch. As a result, of this .conduct, Bates was charged with aggravated . assault with a deadly weapon. A jury convicted Bates of the charge, and he was sentenced to ten years’ confinement. Appealing -the, conviction, Bates raises, several challenges-to the--audio portion of a. audio/video recording which was admitted to evidence. This recording allowed the jury to hear both the statements .of witnesses and statements, by Bates as given to investigating officers at the scene. In addition to his complaints about the admission of the audio/video recording, Bates also claims his trial counsel was constitutionally ineffective.
Although we concur with Bates’ claim that some of the evidence from the recording was admitted in error, we find the error harmless beyond a reasonable doubt. We also find that Bates has failed in his burden to demonstrate that his trial counsel provided ineffective assistance. We, therefore,'affirm the trial court’s judgment and sentence.
I. Factual Circumstance
At the time of the'events giving rise to the assault charge, Bates was staying in an apartmeht with James Dunagan in Paris. The apartment complex appears to -be a collection of small frame buildings rather than the contemporary, multi-family, mul-ti-story complexes commonly built and seen over the past decades. Dunagan said that in the early evening of July 19, 2013, *262 he was inside the apartment watching television, while Bates was outside on the porch, drinking Bloody Marys.[1] Bates had previously installed a video camera from which he could monitor his truck in the parking lot, and a small television display of the view from the camera- was on or near Dunagan’s television set. Through Bates’ monitoring device, Dunagan saw Bates get into his truck, appearing to be ready to leave the premises. This concerned Dunagan because he believed the amount of alcohol he had witnessed Bates consume that day would impair Bates’ ability to drive. Walking onto the porch, Du-nagan observed Bates first back up the manual transmission truck and then lunge forward over a concrete curb stop and across something of a courtyard where he slammed the truck into the front porch of Whitlock’s apartment. Whitlock (an older man) and J.D. Duncan, a friend of Whit-lock’s, were sitting on Whitlock’s porch. Duncan, seeing the rapidly-approaching truck, was able to evacuate the porch before the collision, but Whitlock was not. Dunagan testified that after smashing into Whitlock’s porch, Bates backed up his truck and proceeded to slam into the porch a second time. After this second collision, Bates’ truck became entangled with the debris from the porch, and Bates could not extricate it. Bates turned off the key and started to walk away. A neighbor of Du-nagan’s took Bates by the arm and led him to a chair on Dunagan’s front porch, where Bates sat until the police arrived.
.Whitlock corroborated Dunagan’s description of events. Whitlock stated that he and Duncan were sitting on 'Whitlock’s porch having a drink. He indicated that Bates and Duncan had recently argued regarding “something about somebody owed somebody or something.” Whitlock believed that Bates and Duncan were not getting along very well that day. Whitlock testified that he watched as Bates got into his truck, backed the truck down what he described as a long driveway, and then sped forward (sounding like a “tornado”), smashing into Whitlock’s porch. Whitlock then described Bates backing up and ramming the porch a second time. This second collision caused Whitlock to be pinned between the door of his apartment and the front of Bates’ truck. Whitlock stated that while he was trapped between his apartment and the truck, Bates put the truck in reverse and attempted to back up (Whit-lock believing that he intended to back up and run into the porch a third time), but by this juncture, the truck was entangled in the debris and could not be moved.
As a result of the incident, Whitlock sustained a broken leg, a broken rib, and abrasions, and he required daily home health care for a brief period. As a long-term consequence, he found it necessary to use a cane much more frequently than he had in the past. Whitlock was the named victim in the indictment; the State alleged, and the jury found, that Bates used or exhibited the pick-up truck as a deadly weapon.
II. Controversy Over Admission of Audio/Video Recording
Three of the four points of error raised by Bates on appeal deal with the introduction of an audio/video recording introduced by the State. This recording, admitted as State’s Exhibit 3, was captured by a dashboard camera (dash cam) in one of the responding police officers’ cars. There are three points of error we must address concerning admission of this recording, *263 each having to do -with the admissibility of the audio portion of the recording and .with Bates’ statements recorded on it.
The recording commences with the' travel of the patrol car to the scene and continues after the patrol car comes to a stop in the parking lot of the apartment units. The audio portion records the statements of several witnesses at the scene, as well as comments made by Bates in response to questions posed to him by the police who appeared at the scene. Almost immediately after the policeman exits the patrol car, a burly, shirtless man approaches him and says, “[H]e just tried to kill that man.-” A woman’s voice is recorded as saying, “Oh, my God.” The burly man appears to be quite agitated and excited, pacing back and forth in front of the patrol car, and tells the polieemen, “Get him man. Get him. Don’t let him go nowhere ’cause I’m gonna do something stupid.” Although some of the audio portion of the recording is somewhat unintelligible, it appears that the burly man says the name “Mickey Bates.”
Immediately after this exchange, one of the officers (who. is outside the range of the camera) says, “Come here; what’s the deal, man?” Almost assuredly, this question was directed at Bates, because the speaker responds, “Man, I started my truck up and put it in gear and let out on the clutch and it took off and I couldn’t stop it and it just kept going ... ain’t run over nobody on purpose ... I swear to God.” The officer then asks the speaker (obviously Bates) if he has any weapons on him; and, notably, if he was driving the vehicle. Bates responds with what sounds like, “I cranked it....” Shortly, the sound of handcuffs being applied is heard. From witness testimony at trial, it appears that at this point, Bates was handcuffed and put in a police car.[2]
Over the next five or six minutes, the police officers’ voices are heard to request that people who were witnesses to the event come talk to them. At least- two people are then heard responding to police questioning and by stating that they saw someone drive a truck rapidly into Whit-lock’s porch, back up, and then repeat the collision. After' one of these recitations, one of the officers is heard asking the witness for her contact information.
After talking to these "witnesses, the voices of the officers are heard conversing with one another, but their conversation is mostly indecipherable, although the word “arrest” is clearly audible at some point during these discussions. At no point does anyone provide Bates with the warnings prescribed by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L,Ed.2d 694 (1966). One officer asks Bates (who is then sitting handcuffed in'the rear of the patrol car) his name. Bates identifies himself and says that he lives in the apartment complex. A voice apparently belonging to a police officer[3] asks Bates, “What’s going on Mickey,” and Bates’ response (which is difficult to understand) indicates that he had put his truck in the wrong gear “and let out on the gas and ... couldn’t get off of it ... gas pedal" got stuck.” The officer then inquired how much alcohol he had consumed, and Bates responded that he had not had much. When Bates was asked if he knew Whitlock, he responded in the affirmative and volunteered that he would never intentionally hurt the man, maintaining that the collision had been the *264 result of an accident. When asked if he had tried to help - Whitlock, Bates answered that he had been knocked unconscious by the collision.
After talking to Bates, the police officers are heard talking, apparently out of Bates’ hearing. One officer asked, “We’re gonna get him for assault, right?” Another officer responds affirmatively, saying Bates would be charged with aggravated assault with a. deadly weapon. Within two minutes thereafter, .an officer is heard telling Bates he was under arrest for “assault with a deadly weapon.”
A. Confrontation Clause.
Bates’ first'two points of error are directed at the admission of the video recording. The first point claims error in the admission of the audio portion of State’s Exhibit 3 “before the jury without the proper predicate.”[4] Bates’ second point of error complains that its admission was in error because Bates had a right “to confront the witnesses against him. This includes the right of physical presence of the witness before the jury and the defendant without the defendant’s having to call the witness.” Even so, the body of Bates’ brief concentrates on addressing hearsay and confrontation of witnesses, attempting to address, these two points in a single section of argument. We first look to Bates’ trial objections to consider what argument or arguments have been preserved for our review.[5]
When the State sought to offer State’s Exhibit 3, the following objection and discussion occurred:
[Defense Counsel]: I’m objecting to this DVD being played with the audio because there are people on there that are making statements that could be witnesses subpoenaed here. These people — and also the defendant is questioned without any Miranda warning on his way to the hospital; therefore, it is more prejudicial than probative.[6] ,
Now, I don’t mind it if it’s just what you see but it’s this conversation.
‘ [The State]: This is officers responding to a 911 — three 911 calls. We’re offering it for the purpose of the present sense impression, any excited utterance. The defendant was not under arrest when he was questioned. They’re trying to figure out what was going on. There is another officer video where they do take the witnesses in front of the car and question them. That’s Offi *265 cer Mitchell’s video. We’re not going to offer that into evidence. This just relates to the officers arriving on the scene, trying to find out what is going on and trying to find out from Mr. Bates what happened.
THE COURT: I’m going to overrule your objection.
[Defense Counsel]: Could I say something — respond? 'First, when they get there, there is a man going on — giving— telling what he saw.
[The State]: This is the officer’s present, sense impression, trying to figure out what’s going on.
THE COURT: I’m going to allow it. I think you can do it.-
[Defense Counsel]: All right. ■
It is quite apparent that 'the State must havé believed the nature of Bates’ objections to be directed to complaints about the hearsay nature of the evidence. However, we find that the first part of the objection (which refers to “people on there that are making statements that could be witnésses subpoenaed here,” as well as counsel’s later statement) that “[f]irst, when they get there, there is a man going on — giving—telling what he saw” raise an objection to Bates’ inability to confront potential witnesses against him. We will treat Bates’ first objection as one raising his rights under the- Confrontation Clause of the United States Constitution. See U.S. Const, amend. VI.
' The United States Constitution’s Confrontation Clause “restricts the introduction of out-of-court statements ... in which state actors are involved in a formal, out-of-court interrogation of a witness to obtain evidence for trial.” Michigan v. Bryant, 562 U.S. 344, 131 S.Ct. 1143, 1155, 179 L.Ed.2d 93 (2011). Such statements are testimonial in that the testimony they present is characterized as “‘[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.’ ” Crawford v. Washington, 541 U.S. 36, 51, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (quoting 2 N; Webstee, An American DICTIONARY ■ OP THE ENGLISH LANGUAGE (1828)). Testimonial statements are precluded from admission at trial, under the authority of the Sixth Amendmentj unless the declarant is unavailable and the opponent of the statement has had a prior opportunity to cross-examine the declar-ant. See id. at 68, 124 S.Ct. 1354 (“Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination.”).
The parameters of testimonial versus non-testimonial statements are still evolving. Helpful to our analysis is the following, from the United States Supreme Court:
Statements are nonHtestimonial. when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They,are testimonial when the.circumstances .objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution. . ,
Davis v. Washington, 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). In Davis, the statements at issue were from a 9-1-1 emergency call. The declarant caller “was alone, not only unprotected by police .. ■. but apparently in immediate danger from Davis. She was seeking aid, not telling a story about the past. {Her] present-tense statements showed immediacy.” Thus, the statements were non-testimonial. Id. at 831, 126 S.Ct. 2266. A different result, was reached in Davis’ *266 companion case, Hammon v. Indiana. There, the victim’s
narrative of past events [ ] delivered at some remove in time from the danger she described ... were neither a cry for help nor the provision of information enabling officers immediately to end a threatening situation, [and] the fact that they were given at an alleged crime scene and were “initial inquiries” is immaterial.
Id. at 832, 126 S.Ct. 2266. Hammon’s statements were testimonial.
The United States Supreme Court expounded upon the differences in the Davis and Hammon statements in Bryant. In that case, officers responded to a reported shooting where they found the victim bleeding in the parking lot of a gas station. While the victim told them he had been shot, and may have identified the shooter, the Court took note that nothing the victim told officers explained the reason for the shooting, where the shooter was, whether the declax-ant believed that he might return, etc. See Bryant, 131 S.Ct. at 1163-64, 1166. Discussing Davis, the Court took note that part of the consideration in Davis and its companion, Hammon, had been whether the two victims of domestic violence remained in danger, something that would constitute an ongoing emergency. (Reiterating, we note that in Davis, the victim called while Davis was assaulting her, but in Hammon, the danger had passed; the victim told officers “things were fine,” and “there was no immediate threat to her person.” Davis, 547 U.S. at 830, 126 S.Ct. 2266). The testimonial analysis should consist of an objective evaluation of the primary purpose of the statement in question considering things like the existence vel non of an emergency and the formality of the statement. Bryant, 131 S.Ct. at 1160. We look objectively at the “statements and actions of the parties [that is, the questioner and the declarant] to the encounter, in light of the circumstances in which the interrogation occurs.” Id. at 1162.
In the case at bar, although the police officers were initially responding to an emergency, it seems clear that the immediate danger had passed. Even though it appears that Whitlock was still pinned between Bates’ pick-up truck, the debris from his porch, and his apartment, and even though emergency responders were still arriving and dealing with the situation, there was no indication that anyone other than Bates was the perpetrator of the assault. There was no danger that Bates would abscond, he acted alone, he quickly acquiesced to law enforcement’s authority, and he posed no danger to those around him. Even the excited burly man seen on the recording shortly after the police arrived was describing events that had already occurred, even though recently;[7] the other witnesses heard being interviewed by the police all spoke in the past tense, describing what they had just seen. In the context of the events on the ground, officers were gleaning information concerning an apparent crime which had been completed, and neither the police, nor the victim, nor any of the witnesses were under a prospect of further danger that their *267 words could operate to affect. “Objectively viewed, the primary, if not indeed the sole, purpose of the interrogation^] was to investigate a possible crime ... precisely what the officer[s] should have done.” Davis, 547 U.S. at 830, 126 S.Ct. 2266.
The witness statements recorded on the police dash cam were testimonial, and their admission to evidence was error. As this was a violation of a constitutional protection, we must reverse Bates’ conviction unless we can determine beyond a reasonable doubt thát the error contributed neither to Bates’ conviction nor his punishment. See Tex.R.App. P. 44.2(a).
We consider the following factors in a harm analysis:
1) how important was the out-of-court statement to the State’s case; 2) whether the out-of-court statement was cumulative of other evidence; 3) the presence or absence of evidence corroborating or contradicting the out-of-court statement on material points; and 4) the overall strength of the prosecution’s case.
Scott v. State, 227 S.W.3d 670, 690 (Tex.Crim.App.2007). Here, while, the witness statements contained in the recording were apparently used by the State in order to prove its case, we find they were not of any great importance to the State’s case. Whitlock and Dunagan both testified in detail regarding Bates driving his truck forcefully into Whitlock’s porch, backing up, and smashing into it again. Accordingly, the witness statements on the audio/video recording were cumulative of other (much more detailed) evidence properly allowed into evidence. In this same vein, the State had a strong case against Bates (based on Whitlock and Dunagan’s testimony) without any of the evidence from the audio/video recording. We find the erroneous admission of the testimonial witness statements contained on State’s Exhibit 3 to have been harmless beyond a reasonable doubt.
B. Bates’ Custodial Statement, Without Miranda Warnings
Bates next challenges admission of the portion of State’s Exhibit 3 where officers asked him questions about what had occurred that lead to Bates’ truck being smashed into Whitlock’s porch.[8] We find that at least some of Bates’ statements to police were the result of custodial interrogation and that admission of those statements was error. . We also find, though, that this error was harmless, beyond a reasonable doubt.
The warnings required by Miranda are triggered when a person undergoes custodial interrogation or, in other words, the “questioning initiated by law enforcement' officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.” Miranda, 384 U.S. at 444, 86 S.Ct. 1602; Herrera v. State, 241 S.W.3d 520 (Tex.Crim.App.2007). One is in custody, for these purposes, “only if, under the circumstances, a reasonable person would' believe that his freedom of movemént was restrained to the degree associated with a formal arrest.” Dowthitt v. State, 931 S.W.2d 244, 254 (Tex.Crim.App.1996). In Doiethitt, the Texas Court of' Criminal Appeals suggested four scenarios wherein a person might be deemed in custody:
(1) when the suspect is physically deprived of his freedom of action in any significant way, (2) when a law enforcement officer tells the suspect he cannot leave, (3) when law- enforcement officers *268 create a situation that would lead a reasonable person to believe his freedom of movement has been significantly restricted, and (4) when there is probable cause to arrest and law enforcement officers do not tell.the suspect he is free to leave.
Id. at 255. “[T]he restriction upon freedom of movement [in situations one through three] -must amount to the degree associated with an arrest as opposed to an investigative detention.” Id. “[T]he custody determination is based entirely upon the objective circumstances”; • the subjective intent of the-law enforcement officer and of the defendant are “irrelevant except to the extent that they may be manifested in the words or actions of law enforcement officials_” Id. at 254.
We recently summarized characterizations of custodial statements as follows:
“[U]nwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under Miranda.” Oregon v. Elstad, 470 U.S. 298, 307, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985); see also Carter v. State, 309 S.W.3d 31, 35-36 (Tex.Crim.App.2010) (“Failure to provide the warnings and obtain a waiver prior to custodial questioning generally requires exclusion of statements obtained.”). Custodial interrogation refers to “(1) express questioning and (2) ‘any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.’” Alford v. State, 358 S.W.3d 647, 653 (Tex.Crim.App.2012) (quoting Rhode Island v. In-nis, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980)). That said, statements made voluntarily and not in response to custodial interrogation are admissible. Arizona v. Mauro, 481 U.S. 520, 525-26, 529, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987); Miranda, 384 U.S. at 478, 86 S.Ct. 1602 (“Volunteered statements of any kind are not barred by the Fifth Amendment....”); Stevens v. State, 671 S.W.2d 517, 520 (Tex.Crim.App.1984); Hutchison v. State, 424 S.W.3d 164, 178 (Tex.App.—Texarkana 2014, no pet.).
Johnson v. State, No. 06-13-00129-CR, 2014 WL 3865903, at *2 (Tex.App.—Texarkana Aug. 7, 2014, pet. ref'd) (mem. op., not designated for publication) (footnote omitted).
The first statement given on the audio/video recording' by Bates appears to have been made before he was either handcuffed or put in the police cruiser. Within less than two minutes of the police officer having arrived at the scene, at least one person directed the officers’ attention to Bates as being the operator of the truck that had smashed into Whitlock’s porch. At that time, the policemen asked Bates what was going on at the scene, and Bates responded by saying that he had been in his truck but could not control or stop it. The admission of this statement is not challenged by Bates.[9] Bates was then told by a policeman to step over to á certain area with another of the officers, and it appears that handcuffs were immediately applied to him and he was put in the rear seat of a patrol car.
About seven minutes later, Bates is again asked questions by the police. Officer Brakebill testified that he was the *269 officer questioning Bates in this later segment. Brakebill maintained that despite the fact that Bates was handcuffed and secured in a police car, he was not under arrest at that time. Rather, according to Brakebill, Bates was just being detained while officers investigated' the situation. Brakebill testified that the Miranda warnings were-not administered to-Bates at that time because he was not under arrest. Brakebill said that Bates was not being detained because he was under, arrest; rather, according to Brakebill, the object of the detention was “[t]o find out his side of the story; what took place, was he, in fact, the person behind the wheel of the vehicle when the incident occurred, what his story was, how he played into this situation_”
The State argues that police were in the midst of an investigative detention with Bates and that Bates was not arrested until after the above conversation with Brakebill. The State cites Balentine v. State, 71 S.W.3d 763 (Tex.Crim.App.2002), and Rhodes v. State, 945 S.W.2d 115 (Tex.Crim.App.1997), wherein the Texas Court of Criminal Appeals noted that even where a person was handcuffed and/or secured in a police car, that person was not necessarily under arrest. “Terry[10] provides that a police officer may stop and briefly detain a person reasonably suspected of criminal activity in the absence of probable cause, to arrest the person.” Balentine, 71 S.W.3d at 771. In looking at the facts of Balen-tine, upon which the State relies, we find that Balentine was found late at night near an area where there was a report of shots fired. Balentine walked quickly away from, and kept looking over his should at, the responding officer, who stopped Balen-tine and questioned him. The officer then handcuffed and frisked Balentine, during which search he found a .32 bullet. Al-though Balentine gave somewhat inconsistent answers to the officer’s questions; the officer released him. The next day, officers found a triple homicide in the area where Balentine had been walking, the murder weapon having been a .32 caliber firearm. The State eventually charged Balentine and presented evidence of the bullet found in his pocket the night of the murders. Notwithstanding the officer’s handcuffing of .Balentine, the stop was held to be an investigative detention, not an arrest. Id.
In Rhodes, officers followed a suspicious vehicle from which a Crown Royal bag was discarded; later, the defendant, the passenger of the vehicle, was seen dropping a baggy of cocaine. The officer testified that he handcuffed Rhodes based on concerns for the officer’s safety — Rhodes was detained in a high-crime area,- after dark, and the officer was -alone with Rhodes following a car chase. Rhodes, 945 S.W.2d at 117; When the defendant was handcuffed and held after the car chase ended, the Texas Court of Criminal Appeals found this was an investigative'detention, not an arrest. Id. at 118.
The State also relies on Bartlett v. State, 249. S.W.3d, 658 (Tex.App.—Austin 2008, pet. ref 'd). There, following a country music concert at a motorcycle rally, two different groups got into a fight, and the complainant was struck and required medical attention. When officers arrived, tensions were high,, and witnesses identified Bartlett as the person who had punched the female complainant in the mouth. The officer who evéntually interviewed Bartlett told both Bartlett and -his friends that Bartlett would not be arrested that night but (citing officer safety and in light of the tense situation that existed between the two rival groups), the officer handcuffed *270 Bartlett and drove Mm in a police car to a barn or building on the complex, but away from the crowds (about 2,000 yards away, see id. at 665). There he removed Bartlett’s handcuffs and told him he just wanted his side of the story. Bartlett gave a written statement, which was later admitted at trial. True to his word, the officer returned Bartlett to his group, and the officers made no arrests at that time. Later, Bartlett was charged with assault. See id. The Austin Court of Appeals in Bartlett held that the officer conducted an investigative detention. Bartlett was neither in custody nor under arrest at the time he gave his statement. Id. at 671.
We note significant differences between the situation in Bartlett and that confronting officers at the apartment complex where the issues in this case arose. Law enforcement officers in Bartlett were confronted with what had apparently been a melee between two groups at a motorcyclists’ gathering which had the potential of escalating to a riot.- The testifying officer there made it clear at the time that he handcuffed Bartlett and took him away based on safety concerns. The officer told Bartlett, “[I am taking you away for] our safety,” arid'the opimon suggests he meant both his safety and the safety of Bartlett. Id. at 664, 669. It is true that Brakebill said safety was a ‘consideration in securing Bates,[11] but there is nothing in the record, including the audio/video recording, which captured the circumstances facing officers upon their arrival, suggesting the degree of simmering mayhem as described in Bartlett.[12] Also, significantly, in Bartlett, the officer unequivocally told both Bartlett and his confederates that Bartlett was not being arrested. Rather, the officer made it clear that Bartlett was being removed so the officer could talk to him and that after that, Bartlett would not be arrested that evening. Id. at 670-71. When the officer and Bartlett arrived at the separate building, away from the rival motorcycle groups, Bartlett was uncuffed and asked to relate his version of events. When he agreed to give a written statement, the officer left Bartlett alone in the building and retrieved a voluntary statement form from his car.[13] Importantly, also, Bartlett was then advised of his Miranda rights, and then he executed a written statement. Id. at 665-66. The officer then returned Bartlett to his group. As the officer indicated, Bartlett was not arrested the night of the incident.
The State relies on the following language in Bartlett: “Nor do investigative detentions constitute ‘custody1 in the sense of article 38.22 and Miranda- Thus, a valid investigative detention, which is characterized by lesser restraint than an arrest, does not constitute custody.” Id. at 668. For this last statemerit (that an investigative detention is not custody), Bartlett cited Berkemer v. McCarty, 468 U.S. *271 420, 438-39, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). There, an officer saw McCarty weaving in and out of his traffic lane and stopped McCarty. McCarty could not complete a balancing test without falling. The officer decided to charge the driver with a traffic offense and not let him drive away, but never formally told him' he was being taken into custody. At the roadside stop, McCarty acknowledged recently consuming beers and smoking marihuana. McCarty was taken to the police station where questions about his drug and alcohol use elicited additional statements admitting that he had been drinking beer and smoking marihuana. At no point was McCarty administered1Miranda warnings. McCarty stands for the proposition that one taken into custody, even for a traffic offense, must be provided Miranda warnings once he is in custody. McCarty, 468 U.S. at 438-40, 104 S.Ct. 3138. The section of McCarty cited by Bartlett for the statement that an investigative detention is not custody discusses the limitations of traffic stops and distinguishes those situations, authorized by Terry, from custodial situations. We respectfully find our sister court’s statement that investigative detentions are not custody too broad for application in the situation before us.
Although the police officers in this case may have intended to conduct an investigatory detention of Bates, the conduct of that investigation constituted a custodial interrogation. Bates was deprived of his freedom in a significant way by being handcuffed and isolated in a police cruiser. Even if there is no indication Bates was explicitly told he was not free to leave, he was also not told he was not under arrest (cf. Bartlett), and he clearly was not free to leave. Officers here created a situation where a reasonable person[14] would believe his “freedom of movement had been significantly restricted” to the degree associated with a formal arrest,[15] and officers had probable cause to arrest Bates, based on witness statements they had accumulated. Yet, officers did not tell Bates he was free to leave. Whether the policé intended’ only ah investigative detention, Bates was surely in custody at the time police officers handcuffed him, if not *272 before. ■ Admission of his statement given to police after he was in custody was error.
Erroneous admission of a statement which should have been suppressed under Miranda is error of constitutional dimension, and we must reverse the conviction unless we determine, beyond a reasonable doubt, that admission of the statement did not contribute to the conviction. See Coffey v. State, 435 S.W.3d 834, 843 (Tex.App.—Texarkana 2014, pet. ref'd); see also Tex.R.App. P. 44.2(a).
In conducting a harm analysis of an error involving a constitutional protection,. “the question for the reviewing court is not whether the jury verdict was supported by the evidence. Instead, the question is the likelihood that the constitutional error was actually a contributing factor in the jury’s deliberations in arriving at that verdict.” Scott v. State, 227 S.W.3d 670, 690 (Tex.Crim.App.2007). “At bottom, an analysis for whether a particular constitutipnal error is harmless should take into account any and every circumstance apparent in the record that logically informs an appellate determination whether ‘beyond a reasonable doubt [that particular] error did not contribute to the conviction or punishment.’ ” Snowden v. State, 353 S.W.3d 815, 822 (Tex.Crim.App.2011) (quoting Tex.R.App. P. 44.2(a)). The circumstances to be considered may include, as appropriate, “the nature of the error (e.g., erroneous admission or exclusion of evidence, objectionable jury argument, etc.), whether it was emphasized by the State, the probable implications ‘of the error, and the weight the jury would , likely have assigned to,, it in the course of its deliberations.” Id.
Here, although the nature of the error was the erroneous admission of evidence, the evidence admitted was not in the nature of a confession. Rather, Bates’ statement to officers was entirely exculpatory because he claimed the collision of his truck with the front porch of the apartment to have been an accident. Although he admitted driving the truck (which, in some fact situations may have been an issue to be determined at trial), the identity of the driver was not at issue at trial; the only issue at trial was Bates’ mental state at the time the collision took .place. Other than disputing Bates’ claim,that the collision was accidental, the State did not emphasize or dwell:on Bates’ statement. It is quite nnlikely that the jury gave much weight to Bates’ statement. When one considers the impact of Bates’ statement, it provided a means for Bates to place his defensive theory of accident before the jury without his having to take the stand to state it.
Other than the uncontested statement that Bates actually piloted the truck when it struck Whitlock’s porch (evidence that was readily available elsewhere), the statement contained no inculpatory elements. The jury heard both Whitlock and Dunagan describe Bates’ driving, including that he rammed the porch once, then backed up, and rammed into the structure again. “[C]alculat[ing], as nearly as possible, the probable impact of the error on the jury in light of the other evidence,”[16] we feel confident the erroneous admission of Bates’ statement did not contribute to the conviction. See Wall v. State, 184 S.W.3d 730, 746 (Tex.Crim.App.2006); Wesbrook v. State, 29 S.W.3d 103, 119 (Tex.Crim.App.2000) (considering' overwhelming evidence of guilt in assaying harm from constitutional error),[17]
*273 III. No Ineffective Assistance of Counsel Shown
Bates’ fourth point of error alleges the insufficiency of his trial counsel’s representation. Pointing to acts or omissions of his trial attorney, Bates claims these purported errors amounted to ineffective assistance of counsel. We overrule this point of error.[18]
To prevail on a claim of ineffective assistance of counsel, a defendant must show that counsel’s performance was deficient and that the defendant was prejudiced thereby, Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); Thompson v. State, 9 S.W.3d 808, 812 (Tex.Crim.App.1999), Ineffective assistance of counsel claims must be firmly rooted in the record, with the record itself affirmatively demonstrating the alleged ineffectiveness. Lopez v. State, 343 S.W.3d 137, 142-43 (Tex.Crim.App.2011).[19] Failure to satisfy either prong of the Strickland test is fatal. Ex parte Martinez, 195 S.W.3d 713, 730 n. 14 (Tex.Crim.App.2006). Thus, we need not examine both Strickland prongs if one cannot be met. ' Strickland, 466 U.S. at 697, 104 S.Ct. 2052. “The record on direct appeal is frequently insufficiently developed to support a claim of ineffective assis *274 tance of counsel; the best way to make a sufficient record to support such a claim is by a hearing on a motion for new trial or a hearing on an application for writ of habe-as corpus.” Jackson v. State, 877 S.W.2d 768, 772-73 (Tex.Crim.App.1994) (Baird, J., concurring). “When facing a silent record as to defense counsel’s strategy, the court will not speculate as to defense counsel’s tactics or guess what the reasons might be for taking or not taking certain actions.” Smith v. State, 84 S.W.3d 36, 42 (Tex.App.—Texarkana 2002, no pet.) (citing Jackson, 877 S.W.2d at 771). Because the trial record is directed to the issues of guilt or innocence and punishment, an additional record focused specifically on the conduct of counsel, such as a record of a hearing on a motion for new trial asserting ineffective assistance of counsel, is generally needed. Kemp v. State, 892 S.W.2d 112, 115 (Tex.App.—Houston [1st Dist.] 1994, pet. ref'd). Only when “counsel’s ineffectiveness is so apparent from the record” will an appellant prevail on direct appeal absent a hearing on a motion for new trial asserting an ineffective assistance of counsel claim. Freeman v. State, 125 S.W.3d 505, 506-07 (Tex.Crim.App.2003); Kemp, 892 S.W.2d at 115.
A. Failure to Object to Witness Testimony
Bates’ first allegation of ineffective assistance is based on trial counsel’s failure to object to the testimony of Police Officer Johnny Bangs (due to the omission of Bangs’ name from the State’s witness list) and to the testimony of Police Officer Shawn Upchurch and of Dunagan (both of whom Bates now claims were allowed to testify as expert witnesses). Bates has not shown that he filed a motion for new trial, and there is no indication that Bates took any other action to secure trial counsel’s explanation of her trial strategy or reasons for her acts and omissions with regard to these witnesses.
Bangs offered minimal testimony, describing only his response to an emergency call and his arrival at the scene. Through Bangs, the State offered State’s Exhibit 3 (the audio/video recording from the patrol car driven by Bangs). Although Bangs was not identified on the State’s witness list, we cannot say counsel’s performance was deficient in failing to object to this omission. The most significant part of Bangs’ testimony was his sponsorship of the audio/video recording. When that recording was offered, trial counsel objected as noted earlier in this opinion. However, she expressed no surprise at or said nothing to suggest she was unaware of the existence of the audio/video recording, its contents, or the State’s intent to offer it. In our deferential consideration of trial counsel’s representation, we can easily conjure at least one valid strategic reason for not objecting to Bangs’ testimony— counsel was fully aware that the State intended to offer this recording into evidence. While we have found error in two aspects of the video, it could conceivably have had some evidentiary value, say, if the audio had not been admitted, but the video had. Bates has not satisfied the first Strickland prong with this allegation of ineffective representation.
Next, Bates complains that trial counsel failed to object to the testimony of Upchurch and Dunagan regarding the mechanical operation of a clutch on a standard transmission vehicle (characterizing this as expert testimony).[20] Bates has pro *275 vided no authority to support the proposition that testimony about operating the clutch on a standard transmission vehicle requires expert testimony. Upchurch and Dunagan each based their, testimony on their personal experience with vehicles, and both men testified that they had worked in or run automobile repair garages. A non-expert, or lay, witness may offer testimony based on his personal knowledge or experience. See Fairow v. State, 943 S.W.2d 895, 898 (Tex.Crim.App.1997). Bates has not shown that either witness offered testimony based on “scientific, technical, or other specialized knowledge” that would “help the trier of fact to understand the evidence or to detei’mine a fact in issue.” Tex.R. Evid. 702. Because we cannot conclude that either of these witnesses offered expert testimony or that there was any error in the admission of their testimony, we find that Bates has not shown counsel to have been deficient in failing to object.
Upchurch testified that he believed Bates’ ramming of the porch was an intentional act. Dunagan testified that the operator of a standard-shift vehicle could not accidentally shift gears from neutral to first gear and from reverse to first gear in Bates’ truck (which Dunagan said he had ridden in multiple times). “ ‘While a witness cannot possess personal knowledge of another’s mental state, he' may possess personal knowledge of facts from which an opinion regarding mental state may be drawn. The jury is then free to give as. much or as little weight to the opinion as it sees fit.’”[21] Solomon v. State, 49 S.W.3d 356, 364 (Tex.Crim.App.2001) (quoting Fairow v. State, 943 S.W.2d 895, 899 (Tex.Crim.App.1997)). Lacking any indication of trial counsel’s strategy, we will' not find that she rendered deficient representation based on the record before us.
B. State’s Closing Argument
In its rebuttal to Bates’ closing argument, the State said, “We could have . called other witnesses. We could have called neighbors. We could have called Mr. Duncan. Would it have changed anything?” The State also said, “And if the accelerator was stuck wouldn’t there have been physical evidence to support that?” Bates argues that these statements were impermissible bolstering by the State and that trial counsel was ineffective in failing to object.
Bates’ defensive theory at trial was that his truck malfunctioned and that the collision was ,an accident resulting from that malfunction. In closing argument,. Bates’ trial counsel stressed this causal theory. The State’s arguments mentioned above could be considered rebuttal argument made in response to Bates’ argument or deductions from or summary of the evidence. See Cannady v. State, 11 S.W.3d 205, 213 (Tex.Crim.App.2000). Counsel could have believed these comments to be unobjectionable; without anything in the record to demonstrate this was not a reasonable strategy, we will not find deficient performance.
C. Failure to Object to Testimony
Bates also complains of trial counsel’s failure to object t'o other witness testimony. He claims 'there should have been an objection lodged when Upchurch testified that in his experience investigating drivers who had struck pedestrians, the driver typically “check[s] on the welfare of *276 the victim.” This statement appears to have been based on Upchurch’s personal experience. Bates seems to argue that this testimony was objectionable because Upchurch did not speak to Bates at the scene. However, Officer Brakebill testified that Bates told him he did not try to assist Whitlock because Bates himself was injured or knocked unconscious by the collision. Bates points to testimony of Whit-lock and Dunagan, who testified that someone removed Bates from the truck and assisted him to sit on Dunagan’s porch. At most, these were conflicts in testimony, conflicts for resolution by the jury. We do not see how counsel was ineffective for failing to object. Bates also complains that the State, in closing arguments, stressed this inconsistency. The State argued, with the portion about which Bates complains in italic, as follows: “He backed up and tried to do it again. Then he gets out — he intentionally turns off the car. He intentionally opens the door He intentionally ignores Mr Whitlock. He intentionally leaves away from Mr Whit-lock.[22] And the police are called.” (Emphasis added). In the context of the State’s argument, this was a reasonable deduction from, or summary of, the argument. Counsel cannot be faulted for failing to lodge an objection.
D. Failure to Object to Leading Questions
Bates next complains of numerous instances of. the State’s posing leading questions to its own witnesses. Although leading questions are objectionable, sound trial strategy may dictate that the practitioner refrain from lodging such objections. See Young v. State, 10 S.W.3d 705, 712, 713 (Tex.App.—Texarkana 1999, pet. ref'd).
We also point out that in considering all of the above complaints, we can find nothing that establishes a reasonable probability that but for these alleged deficiencies, the result of the trial would have been different. See Strickland, 466 U.S. at 694, 104 S.Ct. 2052.[23]
Bates also complains the cumulate effect of the errors that he claims were made by trial counsel denied Bates a fair trial. We have found no error (or at least no error in light of our deferential review of trial counsel’s performance) in the trial representation received by Bates. “[W]e are aware of no authority holding that non-errors may in their cumulative effect cause error.” Chamberlain v. State, 998 S.W.2d 230, 238 (Tex.Crim.App.1999); see also Rodríguez v. State, 336 S.W.3d 294, 303 (Tex.App.—San Antonio 2010, pet. ref'd) (because “appellant did not meet her burden of establishing individual instances of ineffective assistance of counsel, we hold that she cannot show an adverse cumulative effect from the actions of trial counsel”).
We overrule. Bates’ point of error complaining he received ineffective representation of counsel at trial. The trial court’s judgment and sentence are affirmed.

. Dunagan testified that Bates drank most of “a fifth of vodka.” In this context, “a fifth” is usually understood to mean one fifth of a U.S. gallon or 757 milliliters. See Merriam-Webster’s Collegiate Dictionary 466 (11th ed.2006).

. Bates does not challenge the admission of this statement; we interpret his argument in ■ his third point of error to challenge admission of the statements he made later, after being handcuffed and put in a police car.

. This voice sounds different than the voice that asked the earlier " question, but none of the speakers, other than Officer Chad Brake-bill, were identified on the recording.

. If by his phrase “sound recording admitted without predicate” Bates intended to object to the,recording of his voice without first satisfying the requirements of Article 38.22, Section 3 of the Texas Code of Criminal Procedure, he does riot discuss, analyze, or argue this in his brief. See Tex,Code Crim. Proc. Ann. art. 38.22 (West Supp. 2014), As explained below, we treat Bates’ arguably multifarious objection as preserving only a Confrontation Clause complaint,

. “[Pjreservation of error is systemic and must be considered, regardless of whether the issue is raised by thp parties.” Flowers v. State, 438 S.W.3d 96, 106 (Tex.App, — Texarkana 2014, pet. ref’d) (citing Gipson v, State, 383 S.W,3d 152, 159 (Tex.Crim.App.2012)).

. We treat this passage as presenting two objections,- the first of which deals with the audio-recorded statements of witnesses as heard on State’s Exhibit 3 and the second which deals with Bates’ oral statements being recorded and offered to evidence without his having first been given Miranda warnings. See Miranda, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. As for the contention that Bates’ statement was “more prejudicial than probative,” that statement is too vague to present a proper objection. There is no indication Rules 403 or 404(b) of the Texas Rules of Evidence were at issue or being, discussed, and a weighing of probative value versus , potential prejudice arises in other contexts, such as Rule 609 of the Texas Rules of Evidence, See Tex.R. Evid. 609.

. That a statement may qualify as an excited utterance (see Tex.R. Evid. 803(2)) "does not alter its testimonial nature.’' Wall v. State, 184 S.W.3d 730, 745 (Tex.Crim.App.2006). Although the State argues that at least some of the witness’ statements recorded in State’s Exhibit 3 qualified as excited utterances, we do not get to that discussion, because the first part of Bates' trial objection, quoted above, did not make specific complaints about hearsay and confrontation. We have treated his objection as one to confrontation. Discrete objections are required to preserve hearsay and confrontation complaints, individually. See Reyna v. State, 168 S.W.3d 173, 179 (Tex.Crim.App.2005).

. Bates never denied, at the scene or at trial, that he owned the Ford pick-up truck found trapped among the detritus of Whitlock’s porch.

. Even if Bates challenged this statement, it would likely have been admissible as, at this point, the officers were engaged in an encounter with Bates, a consensual interaction that Bates could have terminated at any time. See Hunter v. State, 955 S.W.2d 102, 104 (Tex.Crim.App.1997).

. Terry v. Ohio, 392 U.S. 1, 22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

. Albeit a general consideration, Brakebill testified, “Upon making contact with [Bates] and determin[ing] he was the driver of the vehicle for the investigation to ensue for safety purposes he was placed in handcuffs, advised he was detained, placed in the vehicle for further questioning on the scene prior to any arrest being made.” Brakebill did not specify whgt "safety purposes” were served by this conduct.

. The only indication that anything might get out of hand was the burly man’s bravado statement that if the police did not apprehend Bates, he might do "something stupid.” This is hardly indicative of an oncoming riot.

. The only challenged evidence Bartlett sought to suppress was the written statement and photographs taken of Bartlett's hand, showing a tooth mark where he had struck the complainant in the mouth. The initial oral statement, provided before any Miranda warning, does not appear to have been challenged or moved into evidence.

. "The ‘reasonable person' standard presupposes an innocent person." Dowthitt, 931 S.W.2d at 254. This assertion derives from Florida v. Bostick, 501 U.S. 429, 437-38, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), which rejected "Bostick’s argument that he must have béen seized because no reasonable person would freely consent to a search of luggage that he or she knows contains drugs.... ,[T]he ‘reasonable person’ test presupposes an innocent person.” Id. While on a bus, Bos-tick was approached by law enforcement officers who asked a few questions and then asked if they could search Bostick’s bag. In support of this statement, the United States Supreme Court cited Florida v. Royer, 460 U.S. 491, 519 n. 4, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality op.) ("The fact that [respondent] knew the search was likely to turn up contraband is of course irrelevant; the potential intrusiveness of the officers' conduct must be judged from the viewpoint of an innocent person in [his] position.”) (Black-mun, J., dissenting), and Michigan v. Chesternut, 486 U.S. 567, 574, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988) ("This ‘reasonable person’ standard .., ensures that the scope of Fourth Amendment protection does not vary with the state of mind of the particular individual being approached.”). So, while a "reasonable person” may presuppose an innocent person, it is still an objective evaluation of whether that person would believe themselves free to go, be' they sheep or goat)' See Matthew 25:32-33; see also Dowthitt, 931 S.W.2d at 254-55 (”[T]he custody determination is based entirely upon objective circumstances. [Stansbury v. California,] 511 U.S. [318, 323, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (per curiam) ]. The determination of custody must be made on an ad hoc basis, after considering all of the (objective) circumstances.”).

. See Dowthitt, 931 S.W.2d at 255.

. McCarthy v. State, 65 S.W.3d 47, 55 (Tex.Crim.App.2001).

. Our analysis of this Miranda error alerted us to the possibility of an issue involving Articles 38.22 or 38.23 of the Texas Code of *273 Criminal Procedure, In certain situations, the trial court is obligated, even if no request is made, to instruct the jury that it may not consider evidence if the jury finds that evidence was obtained in violation of the laws of the State of Texas, or the United States. See Tex.Code Crim. Proc. Ann. arts. 38,22, § 7, 38.23(a) (West 2005). However, those requirements are only triggered where the evidence raises an issue as to a "genuine factual dispute.” Oursboum v. State, 259 S.W,3d 159, 176 (Tex.Crim.App.2008). For example, if the defendant maintains he involuntarily gave a statement under duress or coercion from law enforcement, but the officer denies the alleged coercive conduct, that might raise a fact issue properly submitted' to the jury. See id. at 176-77. However, "[t]he jury decides facts; the judge decides the application of the law to those facts.” Madden v. State, 242 S.W.3d 504, 511 (Tex.Crim.App.2007); see also Tex.Code Crim. Proc. Ann. art, 36.13 (West 2007) ("Unless otherwise provided in this Code, the jury is the exclusive judge of the facts, but it is bound to receive the law from the court and be governed thereby.”). However, in this case, there was no disputed fact for submission to the jury on the issue of whether evidence was illicitly obtained. The only disputes were whether Bates had already been placed in custody at the time of his statement(s) and whether the protections of Miranda were implicated, Whether a person is in custody, for purposes of Miranda •and Article 38.22, is a legal question and not a factual one. See State v. Saenz, 411 S.W.3d 488, 495 (Tex.Crim.App.2013) (trial court’s findings “inadequate to' make the ultimate legal determination of whether appellee was in custody at the time of the challenged statements.”). A juiy instruction under Article 38.23(a) is only required where there is a "disputed issue[ ] of fact . i,. material to [appellant’s] claim of a constitutional or statutoly violation that would render evidence inadmissible.” Madden, 242 S.W.3d at 509-10. It is only logical that the same requirement applies to a jury instruction required by Article 38,22, Section 7. See Oursbourn, 259 S.W,3d at 176—77. No fact issue having been raised by the evidence, a jury instruction pursuant to Article 38.22, Section 7, or Article 38.23 was not required.

. Strictly speaking, we could deem Bates’ point of error multifarious; he raises several grounds within this single point of error, and some grounds have multiple parts, A point of error that embraces more than one specific ground of error is multifarious, See Bell v. Tex. Dep’t of Crim. Justice-Institutional Div., 962 S.W.2d 156, 157-58 (Tex.App. — Houston [14th Dist] 1998, pet. denied). If a point of error is multifarious, we could refuse to review it. See id..

. However, we may consider multifarious points of error if we can determine, with reasonable certainty, the alleged error about which complaint is made. See id. at 157 n. 1. ■ Because we are able to determine the errors about which Bates complains, we will, in the interest of justice, consider his complaints.

. The State had to prove Bates intentionally rammed Whitlock's porch; Bates’ defense was that the collision was an accident. The state elicited testimony about engaging the clutch, versus releasing it, on vehicles with standard transmissions to establish that if the *275 clutch were quickly released, the vehicle would come to a sudden stop.

. Additionally, testimony that after the first collision, Bates backed up and hit the porch a second time, then attempted to back up again súpports an inference of intentional act.

. See Guevara v. State, 152 S.W.3d 45, 50 (Tex.Crim.App.2004) (acts, words, or conduct of defendant may be considered and intent inferred therefrom).

. Although Bates’ complaints address incidents at the guilt phase of trial, we observe that despite being convicted of a second degree felony and proof of an enhancing prior conviction, Bates was only sentenced to ten years’ confinement, well within the lower range of the punishment that he could have been assessed.