# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-23-00792-CR

---

**Kaitlin Armstrong, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE 403RD DISTRICT COURT OF TRAVIS COUNTY**
**NO. D-1-DC-22-301129, THE HONORABLE BRENDA KENNEDY, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

A jury found Kaitlin Armstrong guilty of the first-degree murder of Anna Moriah "Mo" Wilson and assessed a sentence of ninety years' confinement and a fine of $10,000. The trial court sentenced Armstrong in accordance with the jury's verdict. By three issues, Armstrong argues the trial court erred by failing to: (1) conduct a hearing on her motion for new trial; (2) grant her motion for new trial; and (3) suppress Armstrong's statements to law enforcement. We affirm.

## I.    BACKGROUND

Colin Strickland testified that he met Armstrong on a dating app in October 2019. According to Strickland, their initial date "[p]rogressed into a two-and-a-half-year at times tumultuous . . . relationship." Although Strickland described his relationship with Armstrong as, "[a]t times[,] extremely loving and comfortable," Strickland also testified that he "wasn't sure

that [they] were compatible for a long-term partnership, life partners, as it were," because he harbored doubts that the two "had enough common interests in the world." For instance, Armstrong was a yoga instructor, whereas Strickland had "no interest in yoga."

Strickland testified that the two had a pattern of breaking up and then getting back together. In early 2021, during a winter storm, Armstrong's home sustained "[s]evere damage." As a result, Armstrong moved in with Strickland. However, even while the two were cohabitating, Strickland testified that there were "[i]ntermittent very short periods" where they broke up but remained living together.

Throughout the course of their relationship, Strickland competed as a professional cyclist, and Armstrong would occasionally accompany him to races. In addition to their romantic relationship, Armstrong and Strickland formed a business relationship. Armstrong managed Strickland's finances, they bought a home in Lockhart together, and they formed an LLC. Strickland acknowledged that Armstrong had access to his financial records, email accounts, and passwords.

It was through the cycling community that Strickland met Wilson, a Vermont native, "at a bicycle event in Idaho in September of 2021." Strickland described Wilson as "probably the most exceptional female racer and . . . obviously an immense talent." Strickland viewed Wilson as having huge potential in the sport and wanted "to connect her with as many resources as [he] could to enable her to get whatever support she wanted to get, whatever she wanted out of cycling."

In October of 2021, Wilson and Strickland met again in Bentonville, Arkansas at another racing event. After the race, Strickland, Wilson, and several other cyclists went on a short mountain-bike ride for "networking" purposes. According to Strickland, Armstrong was

2

upset that Strickland "went on this ride with other female cyclists and did not bring her along." Strickland testified that he and Armstrong argued about this on the drive back to Austin; at the conclusion of the drive, their relationship "ended."

About "five or six days later," Strickland saw Wilson again in Austin. Strickland testified that both he and Wilson were recently out of relationships and decided to go on a date. The two then traveled to Marfa, Texas together for a three-day training session. Strickland testified that he and Wilson were "romantic" during this time. According to Strickland, he and Wilson did not discuss having a formal relationship, and the romantic aspect of their relationship ended in early November 2021. In December 2021, Strickland and Armstrong rekindled their relationship. Around this same time, Strickland purchased two pistols, one for himself and one for Armstrong, after she "expressed paranoia" about certain scenarios, such as "road rage incidents" and being "alone on a bicycle ride in the woods in remote areas."

Between December 2021 and May 2022, Strickland and Wilson remained friendly and communicated "[p]retty regularly." However, it often seemed as though Wilson's text messages to Strickland "were just simply not coming through," and the two would turn to other forms of communicating, such as through social media. Strickland learned later during the law enforcement investigation that Wilson's contact information had been blocked on his phone, but he denied having blocked her.

During the first week of May 2022, Strickland and Armstrong traveled to Arizona together. Strickland described his relationship with Armstrong at this point as "very smooth" and expressed that the trip went well. Strickland testified that Wilson contacted him a few days after this trip ended to discuss meeting up when she came down to Austin. According to

3

Caitlin Cash, a close friend of Wilson's, Wilson came to Austin in May 2022 to compete in "a race called Gravel Locos," and "she came a few days early to visit" Cash.

On May 11, Strickland deleted the text thread with Wilson so as not "to agitate" Armstrong. He then saved Wilson's contact information under the name "Christine Wall" to, again, "avoid conflict" with Armstrong. Wilson texted Strickland a picture of herself and the address she was staying at in east Austin—Cash's residence—and the two made plans to go swimming at Deep Eddy, a municipal pool in Austin. Surveillance footage depicts Strickland and Wilson eating dinner at Pool Burger in the early evening. Shortly after 8 p.m., Strickland and Wilson left Pool Burger on Strickland's motorcycle. At around 8:36 p.m., Strickland dropped Wilson off at her home, the two hugged goodbye, and Strickland started heading home. Strickland testified that while he and Wilson were hanging out, he "received a phone call" from Armstrong, as well as a text message. After dropping Wilson off, Strickland "stopped and texted" Armstrong "an alibi," namely, that he had delivered marijuana to a friend in north Austin. Once home, Strickland again attempted to contact Armstrong via text, but she did not respond.

At 9:13 p.m., Wilson's phone sent a message to a podcaster, marking the last activity on her phone. Michael Donovan, one of Cash's neighbors, explained that his doorbell camera recorded video and audio in hour-long segments. Footage from Donovan's camera was admitted into evidence. At approximately 9:15 p.m., a high-pitched scream is heard on the video, followed by three gunshots. Cash returned home, discovered Wilson "covered in blood," and called 911 at 9:54 p.m. Wilson was pronounced deceased shortly thereafter. While collecting evidence at the scene, law enforcement officers discovered that Wilson's bicycle had been moved from Cash's residence and was discarded in a nearby bush.

GPS records from Strickland's cell phone and Armstrong's Jeep from the evening of May 11 were admitted into evidence. Records from Armstrong's phone were also introduced into evidence and indicate that her phone was turned off at 7:30 p.m. and turned back on at 9:47 p.m. The records associated with Strickland's cell phone show that at 9:15 p.m., the approximate time of Armstrong's murder, Strickland's phone was near his home in south Austin. Daniel Portnoy, a detective with the Austin Police Department, testified about two travel logs associated with Armstrong's Jeep, logs 99 and 100. According to Detective Portnoy, at 8:40 p.m., log 99 ended, indicating that the electronics of the vehicle were turned off. At the time the log ended, Armstrong's Jeep was located "right next to the alley" adjoining Cash's residence. At 9:17 p.m., two minutes after Wilson's approximate time of death, log 100 began and Armstrong's Jeep started heading to the home she shared with Strickland. At 9:37 p.m., the vehicle "briefly stopped" on Battle Bend Boulevard and started moving again at 9:46 p.m. Log 100 ended when Armstrong's Jeep reached her home. According to Strickland, Armstrong returned home in "her black Jeep Grand Cherokee and parked in the driveway." Strickland described her demeanor as "[c]alm" and not "anything out of the ordinary."

The following morning, two Austin police officers visited Strickland at his home and informed him that Wilson had been killed. He volunteered to go down to the station with them. During his interview with law enforcement, officers told him that a black Jeep was spotted near Cash's residence, which "was very shocking information."

That same day, Armstrong was arrested on an unrelated charge. Video footage from the roughly hour-long interview that occurred at the station was admitted into evidence. Armstrong was told that her Jeep was seen in the vicinity of where Wilson was murdered.

5

Armstrong denied knowledge that Strickland and Wilson communicated or that they were together the prior afternoon. Eventually, Armstrong left the police station and returned home.

Strickland testified that on the morning of May 13, Armstrong expressed "paranoia that the house might have some microphones in it," so the two visited a coffee shop where she felt able to speak freely. Strickland "suggested several times" that Armstrong make a record of where she was the evening of Wilson's death, while it was fresh in her mind. Armstrong told Strickland that on May 11, she had gone to a waxing appointment, a yoga class, and then "to visit a healer" called "Nahsha" located "at 12th and Chicon." Following that day, Strickland did not have any further contact with Armstrong.

Records from a CarMax in North Austin indicated that on May 13, Armstrong sold her Jeep. The following day, Armstrong flew to New York City to visit her sister, Christine Armstrong. On May 18, Armstrong used her sister's passport to fly to Costa Rica. On June 22, Armstrong, using the name "Allison Paige," received cosmetic surgery and treatment from Dr. Jorge Badilla; namely, a nose job, lip enhancements, browlift, and microneedling. On June 29, Armstrong was apprehended by Costa Rican law enforcement and deported to the United States. She was then arrested for Wilson's murder. On October 11, 2023, nineteen days before trial, Armstrong attempted to escape from custody while en route to a medical appointment. After chasing her for "[a]bout half a mile," Officer Rosalba Johnson was able to apprehend her.

During its investigation, law enforcement obtained a search warrant for Armstrong's iCloud account. According to Detective Richard Spitler, he found a note in Armstrong's iCloud account with the address "1704 Maple Ave." Detective Spitler found this "interesting because this address does not exist." The only place it returned a result was on

Google maps, where it showed Cash's "garage apartment." On May 12, the day after the murder, this note was deleted from Armstrong's iCloud account.

Strickland also testified about certain jealous behavior exhibited by Armstrong throughout their relationship. In late 2020, Strickland began forming a friendship with a woman in Colorado during a time when Strickland felt confident his relationship with Armstrong "was coming to a conclusion." Strickland denied that this friendship ever became romantic but acknowledged that the two occasionally texted and that he "visited [her] on a trip to Colorado in July of 2021," while he was in a committed relationship with Armstrong. Strickland testified that he texted Armstrong about his visit with this woman "after the fact" in an effort "to be transparent." In response, Armstrong sent Strickland a photo of the woman "in pants and a brassiere that was sent to [Strickland] about 10 months earlier." Strickland testified that he had not sent or shown Armstrong that photo and that he did not believe that the woman in Colorado sent Armstrong that photo. Strickland testified that he thought this was a "[s]omewhat unfair response to the situation" and it "made [him] hesitant to . . . fully—inform [Armstrong] of all of [his] actions moving forward."

Text messages exchanged between Strickland and Armstrong were also admitted into evidence. On October 28, 2021, during the period that Strickland testified he and Armstrong were separated, Armstrong texted Strickland, "I know you know better than to show up at [M]eteor with that girl."[1] Strickland replied, "Could you please be an adult?" Later that night, he queried, "Did you call [Wilson]? Wtf?" His subsequent messages of, "Can you please talk?" and "I need to understand what is going on," were answered by Armstrong with, "Sorry, I can't

---

[1] According to several witnesses, the Meteor is a café in Austin that members of the cycling community frequented.

7

talk right now." On March 12, 2022, while Strickland and Wilson were competing at a race in Oklahoma, Armstrong texted Strickland, "Guess what :)" followed shortly by, "Send my love to . . . [Wilson]." Strickland replied, "Can you please stop."

Nicole Mertz described Armstrong as "one of [her] best friends in Austin." Mertz testified that Armstrong described her breakup with Strickland in the fall of 2021 as, "[T]hey were breaking up for good, but . . . they were still going to be in business together[,] and . . . they would still always be really, really close." However, in November 2021, while Mertz and Armstrong were dining out at the Meteor, Armstrong "was just really, really quiet, which was not really like her." Mertz asked what was wrong and Armstrong replied that Wilson "was in town with [Strickland] and she was upset about that and that he had brought [Wilson] to Justine's," a local restaurant, "the night before and she knew that because she got the e-mail from OpenTable about that." While Armstrong and Mertz were at the Meteor, Wilson entered the restaurant. Mertz testified that Armstrong "was pretty angry, like visibly angry," and "left pretty quickly." Mertz testified, "I asked [Armstrong] if—you know, if [Strickland] ever started dating someone else seriously, what would she do, and she said[, ']I would kill her.[']" Although Mertz did not "think too much" about this comment at the time, her first thought upon learning that Wilson died "was that [Armstrong] might have had something to do with it." About "two or three days" after Wilson's death, Mertz contacted the police about her suspicions.

Jacqueline Chasteen testified that she became friends with Armstrong through the cycling community. On January 30, 2022, after a racing event, Chasteen, her husband, and Wilson, along with other members of the racing community, paid a visit to the Meteor. Upon entering the establishment, Chasteen noticed Armstrong was "trembling and shaking." Armstrong confided in Chasteen that she found out Strickland cheated on her with Wilson but

8

"that they were back together and they were working on their relationship." Armstrong told Chasteen that she was still upset because Wilson "was still texting" Strickland, and, though Strickland "had told [Wilson] to leave him alone and that he was with [Armstrong], . . . she wasn't doing that, . . . she was still reaching out to him." Chasteen testified that Armstrong "had said in so many words that she wanted to kill [Wilson] or she had thought about it." However, Chasteen did not take this seriously at the time, and Armstrong clarified her statement with "something to the effect of[, 'B]ut, no, you don't understand, like I had bought a gun or I thought about buying a gun.[']" Chasteen stated that this interaction led her to reach out to police after learning of Wilson's death.

Samantha Perkins, a forensic analyst with the Capital Area Regional Laboratory for Texas DPS, testified that DNA was found on the bike that was discarded in a bush near Cash's residence, of which Armstrong could not be excluded as a potential contributor. Perkins testified that she was not qualified to discuss "activity level, which is what is the more likely scenario," and thus could not elucidate how Armstrong's DNA possibly came to be on Wilson's bicycle.

During her case-in-chief, Armstrong called Matthew Quartaro, who testified as an expert in DNA. According to Quartaro, "Primary DNA transfer is where I touch something and leave skin cells behind. Secondary transfer is where someone else comes by and touches it and the DNA transfers to their hand. And then tertiary would be them moving that DNA to a different object or person."

The defense's proffered theory for the presence of Armstrong's DNA on Wilson's bicycle seat was: (1) Armstrong's DNA transferred to Strickland's motorcycle or motorcycle helmet at some point; (2) on May 11, Wilson picked up Armstrong's DNA through contact with

9

Strickland's motorcycle and/or motorcycle helmet; and (3) Wilson then touched her bike seat, resulting in a transference of Armstrong's DNA to the bike. Quartaro testified that this theory was "possible" but acknowledged that "[a]nything that happens between when DNA is deposited on one thing and comes into contact with someone else could affect how much DNA is present to transfer." He acknowledged that swimming could result in the degradation of DNA and that, when discussing primary, secondary, tertiary, and quaternary transfers, he "would expect there to be less DNA in subsequent transfers."

The State called Dr. Tim Kalafut as a rebuttal witness and the court permitted him to testify as an expert in DNA. Dr. Kalafut testified that he was asked by the State to evaluate activity-level propositions; that is, Dr. Kalafut was asked to determine whether the DNA possibly belonging to Armstrong was more likely to have been deposited by primary transfer or tertiary transfer, given certain facts of the case, like the swimming that occurred between the two times Wilson came into contact with the motorcycle and helmet that possibly contained Armstrong's DNA. Dr. Kalafut testified:

> So if we're still concerned about DNA on Mo Wilson having already gone from the defendant to the motorcycle, either went to her once before the pool and then she gets back on the motorcycle and more gets on her or it somehow survived the swimming pool. All of those things are in my mind . . . lowering the probability of the evidence given this discussion that we're having. I wouldn't have a very high expectation at all of finding DNA on a bicycle down the chain based on what we've already spoken about. But I don't know—kind of common sense if there's DNA on a motorcycle seat or in a helmet and you interact with it once and you go away and come back to it, if the source of that DNA wasn't replenished, if new DNA wasn't deposited, I'm not sure how the DNA on those items would kind of hang out and wait until the second motorcycle ride to get on Mo Wilson.
>
> . . . .

10

> So in our chain events, primary transfer would be direct transfer. That would be going from the defendant to the motorcycle or the defendant to the helmet. Secondary transfer would be going from the motorcycle or the helmet to Mo Wilson. Tertiary transfer is where does it go that Mo Wilson interacts with. . . . And what we know is every time DNA moves down through that chain of activity events, there's less and less DNA available for the next place where you're going to try and recover the DNA from.

Dr. Kalafut opined that, based on the recovery of Armstrong's DNA from Wilson's bicycle, he believed the State's theory of direct transfer was "much more likely" than the defense's theory of tertiary or quaternary transfer. However, Dr. Kalafut also testified that he could not determine how any DNA was deposited and that it was possible that a person's DNA could be discovered in a place that they had never been.

At the conclusion of trial, the jury found Armstrong guilty of murder, and the trial court sentenced her to ninety years' imprisonment. Armstrong filed a motion for new trial, which was overruled by operation of law. This appeal followed.

## II. MOTION FOR NEW TRIAL

By her first and second issues, Armstrong contends that the trial court erred by failing to conduct a hearing on her motion for new trial and by denying her motion. In her motion, Armstrong raised two separate issues: (1) Dr. Kalafut's testimony was false, and newly-discovered evidence contradicted his testimony; and (2) counsel was ineffective for failing to investigate and present additional mitigating evidence.

### A. Standard of Review & Applicable Law

The dual purposes of holding a hearing on a motion for new trial are to: (1) decide whether the case should be retried and (2) prepare a record for presenting issues on

11

appeal in the event the motion is denied. *Smith v. State*, 286 S.W.3d 333, 338 (Tex. Crim. App. 2009). "The right to a hearing on a motion for new trial is not absolute." *Rozell v. State*, 176 S.W.3d 228, 230 (Tex. Crim. App. 2005). "To be entitled to a hearing on a motion for new trial, the movant must (1) raise one or more matters not determinable from the record and (2) establish the existence of reasonable grounds showing that he could be entitled to relief." *Gutierrez v. State*, 602 S.W.3d 17, 20–21 (Tex. App.—Houston [14th Dist.] 2020, pet. ref'd); *see Smith*, 286 S.W.3d at 338–39.

Our review of a trial court's refusal to hold a hearing on a motion for new trial "is limited to the trial judge's determination of whether the defendant has raised grounds that are both undeterminable from the record and reasonable . . . . If the trial judge finds that the defendant has met the criteria, he has no discretion to withhold a hearing." *Smith*, 286 S.W.3d at 340. "[I]t is . . . a judicial requirement that motions for new trial be supported by affidavits," but "this requirement . . . is applicable only to cases where the motion is grounded on matters that are not already a part of the case record." *Bahm v. State*, 219 S.W.3d 391, 395 (Tex. Crim. App. 2007). "To be sufficient to entitle the defendant to a hearing, the motion for new trial and accompanying affidavit(s) 'need not establish a prima facie case' for a new trial.'" *Wallace v. State*, 106 S.W.3d 103, 108 (Tex. Crim. App. 2003). Rather, the defendant must show the existence of "reasonable grounds" that entitle him to relief. *Smith*, 286 S.W.3d at 339. To establish reasonable grounds when the issues raised are not determinable from the record, "the motion [must] be supported by an affidavit, either of the defendant or someone else, specifically setting out the factual basis for the claim." *Id.* "[A]ffidavits that are conclusory in nature and unsupported by facts do not provide the requisite notice of the basis for the relief claimed; thus, no hearing is required." *Id.*

12

Our review of a trial court's failure to hold a hearing on a motion for new trial is for an abuse of discretion. *Id.* Under this standard, we reverse only when the trial court's decision was so clearly wrong as to lie outside the zone of reasonable disagreement. *Id.*

**B.      False/Newly Discovered Testimony**

    **1.      Falsity**

Below, Armstrong challenged the veracity of Dr. Kalafut's testimony on three grounds: (1) he was not qualified on "activity level propositions" and falsely gave the jury the impression that he was; (2) the "activity level propositions" technique is "a 'junk science' based on its rate of error for proficient practitioners"; and (3) Kalafut overstated his degree of confidence.

The Due Process Clause of the Fourteenth Amendment can be violated when the State uses false testimony to obtain a conviction, regardless of whether it does so knowingly or unknowingly. *Ex parte Chavez*, 371 S.W.3d 200, 207–08 (Tex. Crim. App. 2012) (quoting *Ex parte Robbins*, 360 S.W.3d 446, 459 (Tex. Crim. App. 2011)). "[A] witness's intent in providing false or inaccurate testimony and the State's intent in introducing that testimony are not relevant to false-testimony due-process error analysis." *Id.* "In any claim alleging the use of false testimony, a reviewing court must determine: (1) whether the testimony was, in fact, false; and (2) whether the testimony was material." *Ukwuachu v. State*, 613 S.W.3d 149, 156 (Tex. Crim. App. 2020) (citation modified).

To determine whether the evidence was false, "the proper inquiry is 'whether the particular testimony, taken as a whole, "gives the jury a false impression."'" *Id.* (quoting *Ex parte Weinstein*, 421 S.W.3d 656, 666 (Tex. Crim. App. 2014)). "To establish falsity, the

13

record must contain some credible evidence that clearly undermines the evidence adduced at trial, thereby demonstrating that the challenged testimony was, in fact, false." *Ex parte Reed*, 670 S.W.3d 689, 767 (Tex. Crim. App. 2023). "While various types of evidence may serve to demonstrate falsity, the evidence of falsity must be 'definitive or highly persuasive.'" *Id.* "Falsity is a factual inquiry, and we review the court's findings under a deferential standard." *Ex parte Chaney*, 563 S.W.3d 239, 263 (Tex. Crim. App. 2018). As for materiality, "[i]f there is a 'reasonable likelihood' that the false testimony could have affected the jury's judgment, the testimony is material." *Reed*, 670 S.W.3d at 767.

Attached to Armstrong's motion for new trial were affidavits from Tiffany Roy, a forensic DNA expert, and Quartaro. According to Roy, "Modern DNA testing does not allow for conclusions about how the DNA transferred or how long it may have persisted on an item," and Dr. Kalafut's opinion was "open to misinterpretation by laypersons," based on his use of vague language like the phrase "much more likely." Roy averred that "[s]o few experts in the field of forensic DNA are qualified to evaluate findings given proposed activities" and she expressed concern that Dr. Kalafut's "opinion was not reviewed before it was offered."

Quartaro attested that the evaluation of activity-level propositions "refers to how or when DNA was deposited."[2] According to Quartaro, this "is still a novel technique that has not yet been used in American criminal courts or laboratories." Quartaro averred that "[t]he only expert that resides within the United States who might be qualified on this topic, that I am aware of, is Tiffany Roy."

---

[2] This differs somewhat from his trial testimony, in which he stated, "Activity level propositions are sometimes trying to add mathematical calculations to figure out what may be more likely in a case."

14

Dr. Kalafut was permitted to testify as an expert in DNA, but he was not specifically permitted to testify as an expert in activity-level propositions. Armstrong suggests that Dr. Kalafut's opinion on which activity-level proposition was more likely was, in and of itself, a representation that he was qualified to testify as an expert on the subject. However, at no point did Armstrong object to Dr. Kalafut's testimony on this matter. *See Butler v. State*, 6 S.W.3d 636, 642 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd) (appellant was not entitled to hearing on motion for new trial where "[a]ppellant either complains about matters that he could (and sometimes did) object to at trial, or he suggests that evidence was fabricated without explaining why he could not have known of these alleged fabrications at trial").

Even if Armstrong's assertion is correct, she failed to attach any evidence to her motion "that clearly undermines" Dr. Kalafut's qualifications to opine on the subject. *See Reed*, 670 S.W.3d at 767. Roy averred that "it is unclear to [her] what training Tim Kalafut has had regarding evaluations of findings given proposed activities" but acknowledged that Dr. Kalafut's curriculum vitae reflects that he received "one 40[-]hour training in the topic in 2017 and attendance at single[-]day professional workshops," in addition to his other general training in the area of forensic science. In Roy's opinion, this "would not be enough to qualify him to perform or teach the framework" for evaluating activity-level propositions. But it is the trial court, not Roy, that determines whether an expert is qualified or unqualified to opine in a given subject-matter. And, to that end, "a trial court has great discretion in determining whether a witness possesses appropriate qualifications as an expert on a specific topic in a particular case." *Davis v. State*, 329 S.W.3d 798, 813 (Tex. Crim. App. 2010).

A witness may be qualified as an expert by his "knowledge, skill, experience, training, or education." Tex. R. Evid. 702. Dr. Kalafut testified at trial about his general

qualifications in forensic science, and Roy swore in her affidavit as to Dr. Kalafut's additional qualifications. Because Armstrong did not include any evidence which clearly undermines Dr. Kalafut's qualifications to opine on the subject, and because some evidence suggests he was qualified, we conclude that the trial court did not abuse its discretion by denying Armstrong's motion for new trial on this issue without a hearing. *See Davis*, 329 S.W.3d at 813; *Smith*, 286 S.W.3d at 339.

Next, Armstrong argues that the trial court should have held a hearing on Armstrong's claim that Dr. Kalafut's testimony was false because the evaluation of activity-level propositions is a "junk science." In support of this assertion, Armstrong relies primarily on two studies that were attached to her motion for new trial. However, these studies were not relied upon by her experts, nor were they attested to or admitted into evidence. Their existence therefore did not entitle Armstrong to a hearing on her motion.[3] *See Smith*, 286 S.W.3d at 339 ("[A]s a prerequisite to a hearing when the grounds in the motion [for new trial] are based on matters not already in the record, . . . the motion [must] be supported by an affidavit, either of the defendant or someone else, specifically setting out the factual basis for the claim."); *Klapesky v. State*, 256 S.W.3d 442, 454 (Tex. App.—Austin 2008, pet. ref'd) ("A motion for new trial alleging facts outside the record without supporting affidavits is not a proper pleading and is defective; a trial court does not err in refusing to grant a hearing on such a motion.").

Armstrong did not attach an affidavit to her motion for new trial that asserted the evaluation of activity-level propositions was a junk science. Roy stated in her affidavit that

---

[3] Moreover, neither of the studies establishes that the evaluation of activity-level propositions is a junk science. At best, they suggest that scientists should be cautious with their phrasing when discussing activity-level propositions.

"[t]here is still significant debate among the forensic community regarding whether these evaluations have foundation and can be applied consistently and accurately." Even so, "[a] lack of consensus among the scientific community does not alone render scientific evidence 'junk science.'" *Wolfe v. State*, 509 S.W.3d 325, 340–41 (Tex. Crim. App. 2017). Stated otherwise, a "difference of opinion between experts," without more, "is inadequate to render" Dr. Kalafut's "trial testimony false or misleading." *See Ex parte Carter*, 721 S.W.3d 341, 360 (Tex. Crim. App. 2025).

Below, Quartaro stated in his affidavit that he did not believe testimony similar to Dr. Kalafut's had ever been used in an American criminal court before. However, we observe that, although Texas courts have not specifically opined on the matter, courts around the country have allowed similar testimony. *See United States v. Brooks*, 678 Fed. App'x. 755, 757 (10th Cir. 2017) (expert's testimony that "secondary transfer of [defendant's] DNA was 'very highly unlikely'" was not unreliable); *State v. Well*, A20-0858, 2021 WL 2070526, at *1 (Minn. Ct. App. May 24, 2021) ("On redirect, the scientist explained that secondary transfer was unlikely because 'a significant amount of DNA [was] recovered."); *State v. Castro*, 206 So. 3d 1059, 1063 (La. Ct. App. 2016) ("[Expert] stated that a lower level of DNA would be found through secondary transfer, and that, considering the high concentration of [defendant]'s DNA found on [victim]'s right breast, it was highly unlikely that the right breast swab would have contained transferred DNA."). "Opinion testimony that is scientifically accurate at the time of trial does not 'create a misleading impression of the facts' at trial, [*Ex parte*] *Ghahremani*, 332 S.W.3d [470,] 479 [Tex. Crim. App. 2011], because it leads the jury to a correct interpretation of the evidence according to the well-accepted understandings of the scientific community at that time." *Carter*, 721 S.W.3d at 360.

17

Moreover, even Armstrong's motion equivocated over the reliability of this body of science. Despite asserting that Dr. Kalafut's testimony "was materially false in that it gave the impression that ALP testimony is reliable when it is not," Armstrong also asserts that her expert, Roy, "is likely the only individual who is currently qualified in the United States on this topic." If Armstrong is correct that this is an inherently unreliable area of science, then it is not possible for anyone, including Roy, to be qualified to opine on it. She has therefore failed to present any "definitive or highly persuasive evidence" that the evaluation of activity-level propositions is a junk science. *See Ukwuachu*, 613 S.W.3d at 157. Accordingly, we conclude that the trial court did not err by denying Armstrong's motion for new trial without conducting a hearing on this issue.

Lastly, Armstrong asserts that Dr. Kalafut overstated his degree of confidence by testifying that it was "much more likely" that DNA possibly attributable to Armstrong was discovered because it was deposited via primary transfer rather than tertiary or quaternary transfer.

Neither Roy's nor Quartaro's affidavit asserts that Dr. Kalafut's opinion was incorrect. Rather, they simply argue that he had no way of knowing whether his opinion was correct or not. *Cf. Robbins*, 360 S.W.3d at 461 (expert's "trial testimony is not false just because her re-evaluation of the evidence has resulted in a different, 'undetermined' opinion, especially when neither she nor any other medical expert can exclude her original opinion as the possible cause and manner of death").

Indeed, Quartaro testified consistently with the basic premise underlying Dr. Kalafut's testimony. That is, Quartaro testified that he "would expect there to be less DNA in subsequent transfers." Likewise, Dr. Kalafut testified that "after three transfers or certainly

18

after four, there may be [no DNA] left." Thus, because DNA possibly belonging to Armstrong *was* recovered, Dr. Kalafut concluded that "this evidence is much more likely if . . . the defendant grabb[ed] the bicycle" than if three or more DNA transfers occurred. That Dr. Kalafut stated explicitly what Quartaro merely implied does not render his testimony unreliable.

It was ultimately the jury's prerogative to decide which scenario was more likely. Regardless, even if Dr. Kalafut's testimony had been excluded in its entirety, the jury would have still heard testimony that Armstrong could not be excluded as a contributor of the DNA found near the scene of the crime.

Additionally, there was substantial circumstantial evidence indicating that Armstrong was, in fact, present at the scene of the crime, such as the Jeep travel logs showing her location near the time of the murder and the deleted note in her iCloud account that listed an address corresponding to Cash's residence. This, coupled with the fact that neither Roy nor Quartaro was willing to aver that Dr. Kalafut's testimony was false, leads us to conclude that the trial court did not abuse its discretion by determining that Armstrong did not show reasonable grounds that Dr. Kalafut's testimony was materially false. *See Ukwuachu*, 613 S.W.3d at 157; *cf. Wallace*, 106 S.W.3d at 108 (concluding that trial court did not err in refusing to hold a hearing on defendant's motion for new trial because "the trial court could have reasonably concluded (a) that the strength of the prosecution's case was such that the new evidence suggested by the affidavits, even if true, was not compelling enough to probably bring about a different result in a new trial and, therefore, (b) that appellant's motion and accompanying affidavits did not show that he could be entitled to relief").

2.    **Newly Discovered**

19

"In order to be entitled to a new trial on the basis of newly discovered evidence, the movant must show: (1) the newly discovered evidence was unknown to the movant at the time of trial; (2) the movant's failure to discover the evidence was not due to his want of diligence; (3) the materiality of the evidence is such as would probably bring about a different result in another trial; and (4) the evidence is admissible, and not merely cumulative, corroborative, collateral, or impeaching." *Oestrick v. State*, 939 S.W.2d 232, 236 (Tex. App.—Austin 1997, pet. ref'd). "[W]here a motion for new trial relies on newly discovered evidence, if the evidence presented by affidavit would not entitle the defendant to a new trial, the trial court does not abuse its discretion in denying a hearing on the motion." *Id.*

Armstrong argued below that the newly-discovered evidence is: (1) an email from Roy regarding a complaint she planned to make to the Texas Forensic Science Commission regarding Dr. Kalafut's testimony; (2) the complaint about his testimony; and (3) the discovery of the falsity of his testimony. Armstrong provides no argument for why Roy's complaint about Dr. Kalafut's testimony is not merely impeaching. *See Thomas v. State*, 841 S.W.2d 399, 404 (Tex. Crim. App. 1992) ("Impeachment evidence is that which is offered ' . . . to dispute, disparage, deny, or contradict . . . .'").

In any event, evidence of Roy's disagreement with Dr. Kalafut is not sufficient to render it newly-discovered. "Reaching new and different opinions from the same foundational evidence does not render the evidence newly discovered as required . . . even if those new opinions may be material." *Ford v. State*, 444 S.W.3d 171, 183 (Tex. App.—San Antonio 2014), *aff'd*, 477 S.W.3d 321 (Tex. Crim. App. 2015); *Ruffins v. State*, 691 S.W.3d 166, 185 (Tex. App.—Austin 2024, no pet.) ("Although [one expert] provided an opinion of that foundational evidence that differed from that of [another expert], that differing opinion did not render the

20

evidence newly discovered as required by statute."). Armstrong does not complain that her access to the underlying DNA evidence was somehow thwarted, and, to the extent that Armstrong complains that she was not aware of Dr. Kalafut's testimony until trial, "a defendant is not entitled to a new trial to procure evidence that was known and accessible to him at the time of trial, even if defense counsel did not learn about the evidence until later." *See Hamilton v. State*, 563 S.W.3d 442, 448 (Tex. App.—Houston [1st Dist.] 2018, pet. ref'd).

## C. Ineffective Assistance of Counsel

### 1. Standard of Review & Applicable Law

"Before [s]he will be entitled to a hearing on [her] motion for new trial alleging ineffective assistance of counsel, a defendant must allege sufficient facts from which a trial court could reasonably conclude *both* that counsel failed to act as a reasonably competent attorney *and* that, but for counsel's failure, there is a reasonable likelihood that the outcome of [her] trial would have been different." *Smith*, 286 S.W.3d at 340–41. "It is fundamental that an attorney must have a firm command of the facts of the case as well as the law before he can render reasonably effective assistance of counsel." *Ex parte Lilly*, 656 S.W.2d 490, 493 (Tex. Crim. App. 1983); *Lampkin v. State*, 470 S.W.3d 876, 910 (Tex. App.—Texarkana 2015, pet. ref'd). "In assessing the reasonableness of an attorney's investigation, . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S. 510, 527 (2003).

In familiarizing herself with the facts of the case, an attorney is not required to conduct "the most thorough investigation possible." *Ex parte Woods*, 176 S.W.3d 224, 227–28

21

(Tex. Crim. App. 2005). Rather, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Wiggins*, 539 U.S. at 521. "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 528 (quoting *Strickland v. Washington*, 466 U.S. 668, 690–91 (1984)). "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. "Failure to uncover and present mitigating evidence 'cannot be justified as a tactical decision when defense counsel has not conducted a thorough investigation of the defendant's background.'" *Lampkin*, 470 S.W.3d at 913. On the other hand, "[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 911 (quoting *Wiggins*, 539 U.S. at 521–22). We apply "a heavy measure of deference" to counsel's judgments concerning her investigative efforts. *Wiggins*, 539 U.S. at 522. In doing so, we view counsel's performance objectively and, to the extent humanly possible, without utilizing the benefit of hindsight. *Strickland*, 466 U.S. at 690. Generally, the record on direct appeal is not suitably developed to establish the investigative efforts trial counsel did or did not perform. *Hernandez v. State*, 726 S.W.2d 53, 57 (Tex. Crim. App. 1986). And "[w]e will not assume that counsel did not investigate a defense when the record is merely silent as to the depth of counsel's investigation." *Brown v. State*, 129 S.W.3d 762, 767 (Tex. App.—Houston [1st Dist.] 2004, no pet.).

## 2.    Analysis

During the punishment phase of trial, the State focused on the damage Armstrong's actions caused Wilson's family and friends. Cash discussed cherished memories of Wilson, and the subsequent difficulties associated with continuing to live in the home in which her friend was murdered. Wilson's mother, Karen, her father, Eric, and her brother, Matt, each testified about Wilson's life, their love for Wilson, and the impact that her absence has had on their family.

The defense called Michael Armstrong, Judith Knotts, and Christine Armstrong as witnesses during the punishment phase. Michael, Armstrong's father, testified about his love for his daughter. He also testified that his daughter's chosen profession as a yoga instructor was likely because "she's always really been someone that's really cared about other people and other peoples' wellbeing and health."

Knotts, a retired school administrator, visited the Travis County jail in her spare time to provide spiritual support to the inmates. She testified that she "found it a delight to converse with" Armstrong. Knotts described Armstrong as "extremely positive" and "very kind." What Knotts found most impressive about Armstrong "was her empathy." Knotts testified that Armstrong detailed an incident where she helped a fellow inmate cope with emotional outbursts through meditation.

Armstrong's sister, Christine, described her as "a loving, caring, beautiful bright light." During her testimony, the following colloquy with defense counsel occurred:

> Q.    [I]s there anything else that you can tell us that would give more dimension to your sister Kaitlin?
>
> A.    Yes.

Q. What is that?

A. She is just such a special person. She has always been such a special person. Always looked up to you. Always looked up to her. I just love her so much, and I hate that she's been painted in this light because she's not a bad person. She is a really good person and she's always cared for other people, and if you ask any person that knows her, they would say the same thing.

The additional mitigating evidence Armstrong suggests counsel failed to uncover falls into two categories: (1) additional witnesses who would testify to Armstrong's good character, and (2) evidence about Armstrong's lived traumatic experiences, including her strained relationship with her father and her mother's alcoholism.

For Armstrong's motion for new trial, appellate counsel signed an affidavit stating that she had an email exchange with trial counsel wherein trial counsel stated that he had contacted an ex-boyfriend of Armstrong's who "did not want to be involved" and "did not identify any other people familiar with [Armstrong who were] willing to testify for her." Armstrong represented in her motion for new trial that trial counsel informed her that, despite acquiring letters from other individuals concerning her good character in association with a bond reduction hearing, counsel chose to go "a different direction as evidence developed." Armstrong's motion stated that defense counsel had acquired a dozen character letters in association with a possible bond reduction. However, these character letters were not attached to Armstrong's motion for new trial, and only five individuals who did not testify at trial signed affidavits in connection with Armstrong's motion for new trial. Specifically, attached to the motion for new trial were affidavits sworn to by Sharon Armstrong, Armstrong's mother; Nick Gapen; Roberta Hamilton; Deb Prost; and Beth Weeks.

24

"Counsel's failure to call witnesses at the guilt-innocence and punishment stages is irrelevant absent a showing that such witnesses were available and appellant would benefit from their testimony." *King v. State*, 649 S.W.2d 42, 44 (Tex. Crim. App. 1983). Of these five individuals, only two averred that they were available to testify at trial. Gapen stated that, while he "was available to participate as a character witness for sentencing if asked," he did not "say [he] could have traveled to Austin to testify live because [he] would not have been able to financially afford it." Similarly, Weeks stated, "While I cannot say I would have traveled to Austin to testify live because I do not know how much notice I would have had if I had been asked, I would have been willing if my work schedule would have allowed for it. In the event I could not travel live, I would have been willing and available by video conference to testify if that could have been arranged." Sharon stated, "If there was a way I could have watched the trial and testified at sentencing, I would have." However, it was not clear from her affidavit what stood in the way of her attending trial.

On the other hand, Prost swore that she "would have come to Texas to testify in support of [Armstrong] if [she] had been asked to." Hamilton also swore that she "would have traveled from Michigan to Austin, Texas, to participate if I had been asked. In fact, I was in Austin the day of the verdict because I was visiting my son who is an Austin resident, so I know that I was available to participate."

In any event, these five witnesses' affidavits generally discussed their high opinion of Armstrong's character. But the jury was already presented with evidence of Armstrong's good character. Defense counsel's decision not to present additional evidence of her good character is insufficient to demonstrate that his performance prejudiced Armstrong's defense. *Ex parte Martinez*, 195 S.W.3d 713, 731 (Tex. Crim. App. 2006) (holding that no

25

prejudice was shown where mitigating evidence was cumulative of what was presented at trial); *see Hill v. Mitchell*, 400 F.3d 308, 318 (6th Cir. 2005) (holding that no prejudice is shown when counsel's failure to investigate would have revealed cumulative evidence); *Meek v. State*, No. 14-02-01024-CR, 2003 WL 22232670, at *2 (Tex. App.—Houston [14th Dist.] Sept. 30, 2003, pet. ref'd) (mem. op., not designated for publication) ("[W]e hold that a trial court is not required to conduct a hearing on a motion for new trial to hear complaints about counsel's failure to present cumulative evidence.").

Armstrong's motion for new trial also suggested that "by contacting these witnesses, counsel would have also discovered the compelling and powerful evidence about Armstrong's childhood and trauma history that was not brought before the jury that would have mitigated the sentence in this case." "Evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (citation modified) (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)), *abrogated on other grounds by*, *Atkins v. Virginia*, 536 U.S. 304 (2002).

But what is clear is that defense counsel had contacted each of these affiants, albeit earlier in the case. Per Armstrong's motion, trial counsel had already reached out to these individuals to secure character letters in support of a bond reduction. The content of those character letters is not in the record before us and there is nothing in the record suggesting that their existence alone put counsel on notice of any traumatic incidents in Armstrong's life. "In assessing the reasonableness of an attorney's investigation, . . . a court must consider not only the

26

quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527. There is nothing in the record to suggest that counsel should have known that Gapen, Weeks, Prost, or Hamilton had any information concerning Armstrong's traumatic history. *See id.*

As to evidence of Armstrong's troubled upbringing, Christine wrote in her affidavit that when she attempted to discuss Armstrong's childhood with defense counsel, "there did not appear to be any interest and no one seemed to think it was relevant to her case." She "received responses such as, 'Don't worry, no one knows about that and it won't come up,' or, 'We'll prepare you for that and cover that at trial.'" Christine did not detail precisely what from their childhood she discussed with Armstrong's attorneys. Nevertheless, the record reflects that counsel was, to some extent, aware of Armstrong's turbulent upbringing and made a strategic decision not to introduce evidence of it.

During the punishment phase, the State focused its presentation of the evidence on the closeness of Wilson's family and the profoundly devastating impact that her death had on them. In response, defense counsel presented evidence of the love and support Armstrong had from her family members. This strategy emphasized that Armstrong's family had suffered a loss just like Wilson's family.

Trial counsel attempted to persuade the jury that "[t]here is nothing to contextualize Armstrong"; specifically, counsel pointed to the fact that there was nothing to suggest that Armstrong's past predisposed her to criminality given that she came from a loving family and had no criminal history. Evidence concerning a troubled and disunified family, which Armstrong now suggests her trial counsel should have presented, would have been inconsistent with counsel's chosen theory.

27

"While *Strickland* does not require defense counsel to investigate each and every potential lead, or present any mitigating evidence at all, it does require attorneys to put forth enough investigative efforts to base their decision not to present a mitigating case on a thorough understanding of the available evidence." *Woods*, 176 S.W.3d at 226. But "[w]hen an attorney opens Pandora's box, he is not constitutionally required to examine each and every disease, sorrow, vice, and crime contained therein before quietly and firmly closing the cover." *Id.* at 228. Because the record establishes that defense counsel was at least partly aware of Armstrong's troubled childhood, and because defense counsel chose to go "a different direction as evidence developed," we conclude that Armstrong has not presented reasonable grounds that defense counsel provided ineffective assistance of counsel. *See Burger v. Kemp*, 483 U.S. 776, 790 (1987) (attorney was not ineffective when he was "aware of some, but not all of [petitioner's] family history prior to . . . trial" and made "the reasonable decision that his client's interest would not be served by presenting this type of evidence"); *Hocko v. State*, 590 S.W.3d 680, 696 (Tex. App.—Houston [14th Dist.] 2019, pet. ref'd) ("[A]n attorney's decision not to present particular witnesses at the punishment stage may be strategically sound if based on a determination that the testimony of the witnesses may harm the defendant."); *Lampkin*, 470 S.W.3d at 911 ("Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.").

We conclude that the trial court did not abuse its discretion by failing to hold a hearing on Armstrong's motion for new trial as to her claim of her counsel's ineffectiveness for failing to investigate and present certain mitigating evidence because: (1) the State's aggravating evidence focused solely on the damaging effects of the crime rather than Armstrong's bad character, (2) Armstrong did not show that the additional witnesses who would testify to

28

Armstrong's good character would have been helpful, and (3) Armstrong's attorney was aware of some of the mitigating evidence concerning Armstrong's childhood and chose not to present it.

Because we have concluded that Armstrong has not presented reasonable grounds demonstrating her right to relief as to any of her claims, we necessarily cannot conclude that the trial court abused its discretion by allowing her motion for new trial to be overruled by operation of law. *See Holden v. State*, 201 S.W.3d 761, 763 (Tex. Crim. App. 2006) ("A trial court abuses its discretion in denying a motion for new trial only when no reasonable view of the record could support the trial court's ruling."). We overrule Armstrong's first and second issues.

## III. MOTION TO SUPPRESS

By her third and final issue, Armstrong argues that the trial court erred by denying her motion to suppress statements made to law enforcement.

### A. Standard of Review & Applicable Law

*Miranda v. Arizona*, 384 U.S. 436, 444–45 (1966), and Article 38.22 of the Code of Criminal Procedure deem unwarned statements produced by custodial interrogation to be inadmissible unless the accused is first warned of certain rights, like the right to counsel. *Wexler v. State*, 625 S.W.3d 162, 167 (Tex. Crim. App. 2021); *see* Tex. Code Crim. Proc. art. 38.22 § 2(a). "A trial court's ruling on a motion to suppress is reviewed for abuse of discretion and should be reversed only if it is outside the zone of reasonable disagreement." *Wexler*, 625 S.W.3d at 167. We apply a bifurcated standard of review, giving almost total deference to the trial court's factual assessment of the circumstances surrounding the questioning and

reviewing *de novo* the ultimate legal determination of whether the person was in custody under those circumstances. *Id.*

"When a trial court denies a motion to suppress and does not enter findings of fact, we view the evidence in the light most favorable to the ruling and assume the trial court made implicit findings of fact that support its ruling as long as those findings are supported by the record." *Id.* "The party that prevailed in the trial court is afforded the strongest legitimate view of the evidence, and all reasonable inferences that may be drawn from that evidence." *Id.*

When an error is constitutional, we must reverse unless we determine "beyond a reasonable doubt that the error did not contribute to the conviction." Tex. R. App. P. 44.2(a). "[T]he question for the reviewing court is not whether the jury verdict was supported by the evidence. Instead, the question is the likelihood that the constitutional error was actually a contributing factor in the jury's deliberations in arriving at that verdict—whether, in other words, the error adversely affected 'the integrity of the process leading to the conviction.'" *Scott v. State*, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007). In answering this question, courts may consider several factors, including: (1) how important the statement was to the State's case, (2) whether the statement was cumulative of other evidence, (3) the presence or absence of evidence corroborating or contradicting the statement, (4) the overall strength of the State's case; (5) to what extent the statement was emphasized by the State, and (6) how weighty the jury may have found the statement to be compared to the balance of the evidence with respect to the element or defensive issue to which it is relevant. *Id.*

**B.**     **Analysis**

Below, Armstrong filed a motion to suppress the statements she made to Detective Conner. At the hearing on Armstrong's motion to suppress, Detective Conner testified that law enforcement initially arrested Armstrong on a class B misdemeanor warrant for theft of service. Video from the resulting interview was admitted into evidence at the hearing.

At the beginning of the video, Armstrong's handcuffs were removed and she was offered water. Detective Conner then informed Armstrong that she had been picked up on a theft-of-service charge but that law enforcement actually wanted to speak to Armstrong about Wilson's death. Detective Conner asked Armstrong for the spelling of her name and answered Armstrong's questions about the theft-of-service charge. Detective Conner stated that since Armstrong was under arrest, she would be read her *Miranda* rights. However, Detective Conner was then interrupted by a knock on the door. Upon returning to the room, Detective Conner informed Armstrong that she had learned the warrant was no good because of an incorrect birth date.

Before any questioning about Wilson's death occurred, Detective Conner informed Armstrong that she was free to leave and that any statement she made would be purely voluntary.[4] In response to questioning, Armstrong generally declined to make any statement

---

[4] Detective Conner's exact words were:

> [S]o, at this point, you are free to leave at any point. So this is going to be consensual, at this point, because you're not under arrest. Okay? So everything we say here, you're going to leave. You're not—you're not under arrest, you're not going to go to jail right now, nothing like that, okay? Because that warrant is not good, all right? It—it belongs to somebody else, apparently.

31

regarding either the warrant or Wilson's death, but she did state that Strickland had informed her that a woman in the cycling community had died and disagreed that she was jealous of Strickland's relationship with Wilson or that she had any knowledge that Strickland and Wilson had seen each other the day before. After Armstrong asked to leave several times, Detective Conner told Armstrong to "hold tight" while she arranged transportation for Armstrong. Once arrangements were made, Armstrong then left the station. The trial court ultimately denied Armstrong's motion to suppress.

Prior to the time Detective Conner informed Armstrong that the theft of service warrant was no good and that she was free to leave, Armstrong was in custody for purposes of *Miranda*. Armstrong had been handcuffed, involuntarily brought to the police station, and told that she was under arrest pursuant to a warrant.[5] The question then, is whether Armstrong was interrogated. We conclude that she was not. Interrogation refers to (1) express questioning and (2) "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Alford v. State*, 358 S.W.3d 647, 653 (Tex. Crim. App. 2012) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). "Routine booking questions are, by definition, questions normally attendant to arrest and custody and 'do not, by their very nature, involve the psychological intimidation that *Miranda* is designed to prevent.'" *Alford*, 358 S.W.3d at 654

---

So everything that we say in here is just consensual, at this point.
The door is unlocked, you can leave at any time, so—

[5] Moreover, after she was told that she was free to leave, Armstrong stated, "You've just arrested me in front of my house in front of all of my neighbors and carried me in here in handcuffs in front of downtown Austin." In response, Detective Conner stated, "Yeah . . . . I'm so sorry."

(quoting *United States v. Doe*, 878 F.2d 1546, 1551 (1st Cir. 1989)). Additionally, *Miranda*'s safeguards do not "protect suspects from their own propensity to speak, absent some police conduct which knowingly tries to take advantage of the propensity." *Jones v. State*, 795 S.W.2d 171, 176 n.5 (Tex. Crim. App. 1990). Thus, "[a] police officer's response to a direct inquiry by the defendant does not constitute 'interrogation.'" *United States v. Briggs*, 273 F.3d 737, 740–41 (7th Cir. 2001) (collecting cases holding same). During the first part of the interview, Armstrong was asked no questions other than booking questions and her only statements were her own questions to law enforcement. Accordingly, we conclude that Armstrong was not interrogated while she was in custody, for purposes of *Miranda*.

Nevertheless, Armstrong argues that her statements to law enforcement should have been suppressed because she invoked her right to counsel while she was in custody. We disagree. While she was under arrest for the theft of service charge, she made statements referencing counsel twice; "Do I need an attorney here," and "[S]o, if you're reading me my rights, then I should . . . . have an attorney."[6] Neither of these statements constitutes an unambiguous request for counsel. *See Davis v. State*, 313 S.W.3d 317, 341 (Tex. Crim. App. 2010) (under circumstances presented, appellant's statement, "I should have an attorney," was not unambiguous invocation of right to counsel); *State v. Norris*, 541 S.W.3d 862, 867 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd) (reversing trial court's suppression of statement and concluding that appellant's request, "Well, give me a lawyer or something 'cause I'm not sure I have," was ambiguous). The court of criminal appeals has suggested that, in cases where the purported request for counsel is couched in a "should" statement, "the surrounding

---

[6] This second statement was made after Detective Conner informed Armstrong that she would be read her *Miranda* rights in connection with the theft-of-service charge.

circumstances [are] highly relevant considerations." *Davis*, 313 S.W.3d at 341. In this case, Detective Conner testified at the suppression hearing that she interpreted these statements as questions. *Cf. id.* at 340 (explaining that in cases where "should" statement was found to be unambiguous request for counsel, "those courts also observed that law enforcement agents who heard the statements understood each to be a request for counsel"). And, in context, Armstrong's references to counsel were surrounded by her attempts to gain more information about the theft-of-service charge and understand why she was in police custody in general. *See id.* at 341. The trial court could have reasonably concluded that, given the circumstances, Armstrong's request for counsel was ambiguous. After Detective Conner told Armstrong she was no longer under arrest and asked whether she could clear certain things up relating to Strickland, she stated, "I feel like I should have an attorney present." This, again, was not an unambiguous invocation of her right to counsel. *See Davis*, 313 S.W.3d at 341.

But even if these were unambiguous requests, "[t]he right to counsel under *Miranda* cannot be invoked anticipatorily." *See State v. Johnson*, 707 S.W.3d 256, 257–58 (Tex. Crim. App. 2024) (appellant's statement, "I need to talk to a lawyer," made while under arrest but prior to interrogation did not invoke *Miranda* protections so as to preclude later police-initiated interrogation); *Estrada v. State*, 313 S.W.3d 274, 296 (Tex. Crim. App. 2010) ("Even if we were to assume that appellant unambiguously invoked his rights to counsel and to silence during the noncustodial interrogation setting, we do not agree that the police were required to honor these invocations." (internal footnote omitted)); *see also McNeil v. Wisconsin*, 501 U.S. 171, 182 n.3 (1991) (explaining that "[w]e have in fact never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than 'custodial interrogation'"). Stated otherwise, without being subjected to a custodial interrogation, an accused's invocation of

counsel will not bar police from engaging further. *Johnson*, 707 S.W.3d at 257–58. Having concluded that Armstrong was not subject to interrogation during the first half of the interview, we need only address whether Armstrong was in custody during the second half of the interview.

Armstrong argues that despite being told she was free to leave, she was still under arrest. Again, we disagree. Relevant factors for determining whether questioning occurred in a custodial environment include: (1) the location of interview, (2) statements made during the interview, (3) whether physical restraints were used during the interview, and (4) the release of the defendant at the conclusion of the interview. *Howes v. Fields*, 565 U.S. 499, 509 (2012). "[T]he subjective intent of law enforcement officials to arrest is irrelevant unless that intent is somehow communicated or otherwise manifested to the suspect." *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996). "The determination of custody must be made on an ad hoc basis, after considering all of the (objective) circumstances." *Id.* at 255. "Stationhouse questioning does not, in and of itself, constitute custody." *Id.*

In total, Armstrong stated that she wanted to leave six times. *See Estrada*, 313 S.W.3d at 296 (appellant's representation that "he wanted to leave and go home" was indicator that no reasonable person would have believed he was not free to leave). And in response, Detective Conner repeatedly reassured Armstrong that she was free to leave and any statement she made would be purely voluntary. It is true that, despite this assurance, Detective Conner continued questioning Armstrong and informed her that if she left, law enforcement would be limited to "one side of the story." However, "[i]f a law enforcement officer informs the suspect that he is not under arrest, that statements are voluntary, and that he is free to leave at any time, this communication greatly reduces the chance that a suspect will reasonably believe he is in custody." *United States v. Craighead*, 539 F.3d 1073, 1087 (9th Cir.

35

2008); *United States v. McCarty*, 475 F.3d 39, 46 (1st Cir. 2007) (holding that although interrogation began while appellant was in custody, custody ended once appellant was "no longer handcuffed" and was told "that he was not under arrest, that he was free to leave at any time, and that he did not have to answer any questions").

Moreover, Armstrong does not identify any statement she made to law enforcement that was incriminating. Although the protections of *Miranda* apply to both inculpatory and exculpatory statements, *Innis*, 446 U.S. at 297, the less inculpatory a statement, the less likely that its erroneous admission was harmful, *Bates v. State*, 494 S.W.3d 256, 272 (Tex. App.—Texarkana 2015, pet. ref'd) (concluding that erroneous admission of unwarned custodial statement was harmless because "the statement contained no inculpatory elements"). Additionally, where the inculpatory statement is merely cumulative, it may be harmless. *See Jordy v. State*, 969 S.W.2d 528, 533 (Tex. App.—Fort Worth 1998, no pet.).

During the interview, Detective Conner told Armstrong that her name came up during law enforcement's interview with Strickland, that they were informed by Strickland that Armstrong was upset that he went out with Wilson on the day of her murder, and that her vehicle was spotted next to Wilson's home. Armstrong told Detective Conner that she did not know whether Strickland was talking to Wilson behind her back and that she was not aware that Strickland had seen Wilson the evening of the murder. Detective Conner testified that law enforcement learned both of these statements were false.

Additionally, Detective Conner testified that Armstrong "popped her head up and she rolled her eyes to the side in a frustrated, almost angry manner" after the topic of Strickland's relationship with Wilson came up. Detective Conner testified that this moment "stood out to [her] because [Armstrong] had been pretty emotionless throughout the entire interview."

36

The State primarily introduced evidence of the interview to contrast Strickland's level of cooperation with law enforcement with Armstrong's and to demonstrate that Armstrong had an emotional reaction after the topic of Strickland and Wilson's relationship came up. But additional, stronger evidence concerning both Armstrong's lack of cooperation and her jealousy came in elsewhere at trial. For instance, the evidence established that Armstrong fled from law enforcement twice. *See Clay v. State*, 240 S.W.3d 895, 905 n.11 (Tex. Crim. App. 2007) ("Evidence of flight evinces a consciousness of guilt."); *Williams v. State*, 832 S.W.2d 152, 154 (Tex. App.—Houston [14th Dist.] 1992, pet. ref'd) ("[E]scaping from jail confinement awaiting trial can also be construed as evidence of guilt."). The first time, she flew to Costa Rica with her sister's passport, received cosmetic surgery to alter her appearance, and was using the alias "Allison Paige." The second escape attempt occurred just nineteen days before trial. Additionally, Strickland testified about certain jealous episodes exhibited by Armstrong, and Mertz and Chasteen both testified that Armstrong confided in them that she desired to or had made plans to kill Wilson.

Armstrong's statements made at the precinct were consistent with her defensive theory that she was not jealous of Wilson and had nothing to do with her murder. Armstrong does not identify how these statements were harmful, and we conclude beyond a reasonable doubt that they were not. *See Bates*, 494 S.W.3d at 272; *Jordy*, 969 S.W.2d at 533. We overrule this issue.

## IV.    CONCLUSION

We affirm the trial court's judgment of conviction.

_____

Maggie Ellis, Justice

Before Chief Justice Byrne, Justices Kelly and Ellis

Affirmed

Filed:   January 23, 2026

Do Not Publish